GUSTAVE C. DARWEGER, Respondent, *v.* CHARLES B. STAATS et al., Appellants.

(Argued March 14, 1935; decided April 26, 1935.)

*Harold J. Hinman* and *J. Vanderbilt Straub* for appellants.

*John J. Bennett, Jr., Attorney-General (Henry Epstein* of counsel), for the State of New York.

*Harold H. Straus* and *Stanley Osserman* for Dress Code Authority et al., *amici curiæ.*

*Edward J. Halter* for Third Regional Board for the Brewing Industry, *amicus curiæ.*

*Samuel H. Pearis* for respondent.

*Thomas Francis Woods, amicus curiæ.*

CRANE, Ch. J.   The National Industrial Recovery Act, passed June 16, 1933 (48 U. S. Stat. 195), declared a national emergency in these words: " A national emergency productive of widespread unemployment and disorganization of industry, which burdens interstate and foreign commerce, affects the public welfare, and undermines the standards of living of the American people, is hereby declared to exist.   It is hereby declared to be the policy of Congress to remove obstructions to the free flow of interstate and foreign commerce which tend to diminish the amount thereof; and to provide for the general welfare by promoting the organization of industry for the purpose of cooperative action among trade groups, to induce and maintain united action of labor and management under adequate governmental sanctions and supervision, to eliminate unfair competitive practices, to promote the fullest possible utilization of the present productive capacity of industries, to avoid undue restriction of production (except as may be temporarily required), to increase the consumption of industrial and agricultural products by increasing purchasing power, to reduce and relieve unemployment, to improve standards of labor, and otherwise to rehabilitate industry and to conserve natural resources."

As a step in the direction of effectuating this National policy, section 3 (NIRA) provides for codes of fair competition:

" (a) Upon the application to the President by one or more trade or industrial associations or groups, the

President may approve a code or codes of fair competition for the trade or industry or subdivision thereof, represented by the applicant or applicants, if the President finds (1) that such associations or groups impose no inequitable restrictions on admission to membership therein and are truly representative of such trades or industries or subdivisions thereof, and (2) that such code or codes are not designed to promote monopolies or to eliminate or oppress small enterprises and will not operate to discriminate against them, and will tend to effectuate the policy of this title;   *   *   *.

" (b) After the President shall have approved any such code, the provisions of such code shall be the standards of fair competition for such trade or industry or subdivision thereof.   *   *   *

*   *   *   *   *   *   *

" (d) Upon his own motion,   *   *   *   the President,   *   *   *   may prescribe and approve a code of fair competition for such trade or industry   *   *   *."

By section 10, subdivision (b), " The President may from time to time cancel or modify any order, approval, license, rule, or regulation issued under this title; and each agreement, code of fair competition, or license approved, prescribed, or issued under this title shall contain an express provision to that effect."

Attention is directed here to the option given to the President as well as to various trades. All industry is not required to be codified. First, it is optional with the business or enterprise; secondly, it may be forced by the President at his option; and further yet, after a code has been adopted and approved, it may be modified by the President as to any of its regulations in the future. The whole matter rests upon the approval of the President, based upon findings made in accordance with the law.

Under these provisions of the National Industrial Recovery Act the Retail Solid Fuel Industry prepared its code, which was approved on February 14, 1934. Sec-

tion 1 of article III established two agencies: (a) The National Code Authority; (b) the Divisional Code Authorities. Pursuant to subdivision 9 of this article, the Divisional Code Authority, Division No. 3, was established and was stated to embrace the State of New York, with the exception of the counties of Bronx, New York, Kings, Queens, Richmond, Nassau and Suffolk. Here again we find in this Code that both the National Code Authority, which was duly established, and the Divisional Code Authority have been given certain discretionary powers. Under article V, dealing with marketing practices, we find these provisions in subdivision 4:

" Whenever, upon complaint or upon its own initiative without complaint, the National Code Authority is of the opinion that an emergency exists within the industry or within any retail trade area thereof, in that destructive price-cutting is being engaged in to such an extent as to render ineffectual or seriously endanger the effectuation of the purposes of this Code or of the Act, the National Code Authority shall forthwith certify such conclusion to the Divisional Code Authorities.

" (a) Upon receipt of such notice each Divisional Code Authority, after a full hearing upon notice to all known interested parties within the respective trade areas, shall determine whether or not such an emergency exists within the Division or within any one or more trade areas thereof, and in the event it appears necessary to declare such an emergency to exist, thereupon to open the hearing for presentation of all matters which may have a bearing upon costs to be ascertained and determined as provided in subdivisions (b) and (c) hereof.

" (b) In any retail trade area of any Division where such emergency has been declared to exist the Divisional Code Authority shall forthwith ascertain to the extent reasonably practicable for such retail trade area the cost to members of the industry of their products and services

on the basis of actual cost sheets of members of the industry within such retail trade area and all other available data, for each kind, grade, size and blend of solid fuel and each classification of customers within such retail trade area.

" (c) On the basis of costs ascertained as above, the lowest cost (which shall include an allowance for all items of actual cost, but exclusive of any elements of profit or return on capital) which shall still insure within such retail trade area the maintenance of rates of pay, hours of labor, fair competition, and other purposes of this Code and of the Act, shall be determined by the Divisional Code Authority, such figure to be the lowest figure reasonably compatible with the maintenance of the purposes herein set forth."

Reviewing these provisions we find the National Recovery Act declaring an emergency, but requiring no particular industry to be codified, leaving it entirely to the option of the industry or the President. When it comes to price-fixing we again find that an option has been left, not only to the National Code Authority in the Solid Fuel Industry, but also to the Divisional Code Authorities. *First*, the National Code Authority must find that an emergency exists; *second*, upon certifying the fact to the Divisional Code Authority, the latter shall again determine whether or not an emergency exists requiring the fixing of prices. But this is not all. The Administrator, by section 2 of article III, may appoint one non-voting member of the National Code Authority, who may also sit with the Divisional Code Authority at the request of the Administrator. Paragraph (d) of subdivision 4 of article V gives this administrative appointee further discretion. It reads: " Such determinations of cost shall promptly be approved or disapproved in writing by the Administrative appointee on the Divisional Code Authority, and upon approval shall become effective, subject to the right of the Adminis-

trator to approve, disapprove or modify the same. All such determinations of cost by the Divisional Code Authorities shall forthwith be filed with the National Code Authority and the Administrator."

The Divisional Code Authority, Division No. 3, on June 29, 1934, after a hearing and taking of testimony, promulgated its Order No. 3E which fixed a floor-level price for the sale of coal in certain counties embraced in said Division, including the county of Broome. Said order in part reads as follows:

" It is hereby resolved, That in the trade area of Broome, Cortland, Chenango, Otsego, Delaware and Sullivan Counties, also the Counties of Chemung, Tioga, Tompkins, Schuyler, the Townships of South Waverly, Sayre and Athens in Pennsylvania, and Southern Seneca County including Townships of Romulus, Ovid, Lodi, Covert and Varick, the lowest figure of cost covering the cost of products and the cost of services on the various domestic sizes of anthracite coal including Pea Coal shall be the Old Line Company's circular price plus the net ton freight rate to destination plus $3.15 per ton service charge; and on steam sizes of anthracite shall be the Old Line Company's circular price plus net ton freight to destination plus $2.75 per ton service charge; and on Coke shall be the Producing Company's circular price plus the net ton freight to destination plus $3.15 per ton service charge; and on all grades, kinds and sizes of bituminous coal shall be the bituminous code mine price plus freight to destination plus $2.75 per ton service charge."

That by the said order the said floor-level price was computed as follows:

" (a) On domestic anthracite coal, including Pea coal, the Old Line Company's circular price, plus net ton freight to destination, plus $3.15 per ton service charge.

" (b) On steam sizes of anthracite, the Old Line Company's circular price, plus net ton freight to destination, plus $2.75 per ton service charge.

" (c) On bituminous coal, the bituminous code mine price, plus freight to destination, plus $2.75 per ton service charge."

Section 5 of article V of the Code reads as follows: " The selling or offering for sale of any of the products or services of this industry for which the costs may have been determined as provided in Section 4 of this Article V, at such prices or upon such terms or conditions of sale that the buyer shall pay less therefor than such determined cost, shall be deemed an unfair competitive practice in violation of the requirements of this code."

By section 10(a) of the National Industrial Recovery Act, any violation of the rules and regulations prescribed by the President shall be punishable by fine of not to exceed $500, or by imprisonment for not to exceed six months, or both.

The plaintiff in this case is a retailer of solid fuel and has his yard and principal place of business in the city of Binghamton, New York. He has been threatened by the defendants, " The Divisional Code Authority, Division No. 3, for the Retail Solid Fuel Industry " with prosecution and imprisonment for failure to comply with the price regulations as fixed by Order No. 3E.

It is not claimed that any of the provisions of law heretofore referred to, the National Industrial Recovery Act or the Retail Solid Fuel Industry Code, have any application to him or to his business. It is conceded that his business is purely intrastate and these measures, above quoted, have application solely to interstate business. The Solicitor-General of the State, upon the argument and also in his brief, states that the act of Congress and the Codes thereunder relate solely to interstate commerce. How then comes it that this little retail business, purely intrastate and carried on by the plaintiff in Binghamton, is thus threatened with prosecution for the violation of law? The law is the State law, chapter 781 of the Laws of 1933, sometimes referred to as the State Recovery

Act. As its constitutionality is challenged, we quote in full the pertinent provisions:

" Section 1. Legislative finding; statement of policy. A national emergency productive of widespread unemployment and disorganization of industry, which likewise prevails in the state of New York, which burdens intrastate, interstate and foreign commerce, affects the public welfare, and undermines the standards of living of the American people and of the people of the state of New York, is hereby declared to exist. The existence in this state of such present acute economic emergency, and the effects and certain causes thereof as declared in section one of title one of the national industrial recovery act, enacted by the congress of the United States, effective June sixteenth, nineteen hundred thirty-three, are hereby recognized; and it is hereby declared that said emergency, the causes and effects thereof, as so declared, relate as well to commerce in this state wholly intrastate in character as to interstate and foreign commerce and transactions affecting interstate and foreign commerce carried on in this state. It is hereby declared to be the policy of this state to cooperate in the furtherance of the objects and purposes declared in said act of the congress, and each and every provision of this act shall be construed in accordance with the policy so declared, and to make uniform the standards of fair competition prevailing in intrastate commerce and industry with those of interstate commerce required by the provisions of the said national industrial recovery act which are applicable in interstate commerce in the state of New York.

" § 2. Filing of codes and agreements. 1. The secretary of state is hereby authorized to receive for filing and shall file in the office of the department of state a copy of each code, agreement, license, rule or regulation in effect pursuant to such act of the congress, pertaining, affecting or in any way relating to the conduct of business in the state and duly certified as a true copy of such docu-

ment or documents by the officials in charge of the administration of the provisions of title one of the said national industrial recovery act or by their duly authorized agents. Upon such filing of a copy so certified of a code of fair competition for any trade, industry or subdivision thereof, as approved by the president of the United States, or of any agreement or license or of any rule or regulation provided for under title one of the said national industrial recovery act, such code, agreement, license, rule or regulation shall be the standard of fair competition for such trade or industry or subdivision thereof in the state as to transactions intrastate in character, and any violation of any provision of such code, agreement, license, rule or regulation shall be a misdemeanor, and upon conviction thereof, the person convicted shall be fined not more than five hundred dollars for each offense, and for each day such violation continues a separate offense subject to the fine herein prescribed shall be deemed to have been committed."

As is evident, section 1 of this law merely expresses the same policy as that of the National Recovery Act. Section 2 makes the filing of any code approved by the President the law of this State, a violation of which is a misdemeanor.

At this point certain considerations are necessary in passing upon the one question — whether the Legislature has passed any law regarding unfair competition, or has declared any emergency in the coal industry which requires legislation, or whether it has passed this legislative function over to other bodies. Considering that the National Recovery Act and this Fuel Code have no application to the State of New York, dealing solely with interstate commerce, they have no more effect here for intrastate commerce than would a law of Connecticut, Massachusetts or California. They are made to operate here by the mere declaration of the Legislature that, by the filing in the office of the Secretary of State of the

Code, it shall become the law of the State of New York relating to unfair competition. Would it be constitutional for our Legislature to adopt a law of Massachusetts or of Connecticut or of California in any such way?

Section 1 merely declares a policy, merely says an emergency exists in industry and in employment, but how that emergency shall be met or what measures shall be taken in the wisdom of our Legislature to meet the emergency is nowhere stated. There is no statement or finding by the Legislature that an emergency exists in the coal industry or that it is necessary or in the judgment of the Legislature requisite that a code of unfair practices be adopted by that industry. The Legislature has left this determination entirely to the President of the United States or to the National Code Authority. But more than this, it has left to an outside body — outside the State of New York, a National Code Authority — to determine that even an emergency exists. The necessity of price-fixing in the coal industry depends upon an emergency declared by the National Code Authority. This is not enough; the price regulation must be approved by the Federal Administrator.

Stripped of all its verbiage, and narrowing these provisions down to the real authority, we find that the Legislature of the State of New York has turned over to the National Administrator the question of determining whether there shall be price-fixing in New York State of coal and what it shall be. The Legislature has left too many things to be determined by other bodies to make this law constitutional.

The State Legislature cannot leave to Congress to determine that an emergency exists in intrastate business in the State of New York, and we may say in passing, that Congress has not attempted to do so. The Legislature cannot leave to a body of industrials throughout the United States to declare that an emergency exists here in intrastate business, and to provide methods and means

for meeting that emergency. The Legislature cannot leave to a National Administrator to declare what shall or shall not be a crime in New York State.

The law governing the functions of the Legislature is well understood. Section 1 of article III of the New York State Constitution provides:

" Legislative powers. Section 1. The legislative power of this State shall be vested in the Senate and Assembly."

This legislative power cannot be passed on to others. What is legislative and what administrative is not always easy to define, but the difficulty is not apparent here.

" The senators and assemblymen are selected by the electors of their respective districts to represent them in the legislature of the state and to enact such laws as shall be requisite and advisable. The people, who have entrusted them with legislative power, have the right to demand the exercise of their knowledge, judgment and discretion in the framing and in the enactment of laws, and in so far as their duties are strictly legislative, have prohibited them from delegating that power to others." (*Stanton* v. *Board of Supervisors*, 191 N. Y. 428, 432.)

Power given to a Public Service Commission to fix rates is the subject of inquiry in *Wichita R. R. & Light Co.* v. *Public Utilities Commission* (260 U. S. 48, 59). The court said: " In creating such an administrative agency the legislature, to prevent its being a pure delegation of legislative power, must enjoin upon it a certain course of procedure and certain rules of decision in the performance of its function. It is a wholesome and necessary principle that such an agency must pursue the procedure and rules enjoined and show a substantial compliance therewith to give validity to its action. When, therefore, such an administrative agency is required as a condition precedent to an order, to make a finding of facts, the validity of the order must rest upon the needed finding." (See, also, *Panama Refining Co.* v. *Ryan*, 293 U. S. 388; also *Barto* v. *Himrod*, 8 N. Y. 483.)

In *United States* v. *Grimaud* (220 U. S. 506) it was held that while it is difficult to define the line which separates legislative power to make laws and administrative authority to make regulations, Congress may delegate power to fill up details where it has indicated its will in the statute, and it may make violations of such regulations punishable as indicated in the statute. Authority to make administrative rules is not a delegation of legislative power, and such rules do not become legislation because violations thereof are punished as public offenses.

In this day when the demands upon the State Legislatures for necessary and important laws are increasing every year we must not be rigid in our construction of legislative power. More and more must the laws become general in form, leaving to commissions, boards or other administrative bodies the establishment of rules and regulations and the determination of the facts to which the general law will apply. To make the violation of any such adopted rule or regulation a crime, is not a delegation of legislative power. (See *Matter of Trustees of Village of Saratoga Springs* v. *Saratoga Gas & Elec. L. & P. Co.*, 191 N. Y. 123, 145.) " The law books are full of statutes unquestionably valid, in which the Legislature has been content to simply establish rules and principles, leaving execution and details to other officers."

We have here, however, in this act before us no such establishment of a rule or principle. The Legislature has declared an emergency in industry and left it for others beyond its power or control to do the rest. It has not created or appointed any agency representing the People of the State to form rules or regulations or to even determine that price-fixing in the coal business is necessary.

In arguing in support of this law three assumptions are made: 1. That the Legislature has found an emergency in the coal business, and that the facts necessitate fixing the sales price of solid fuel. 2. That the Legislature has

appointed or created an agency to carry out its will and administer the law through reasonable rules and regulations. 3. That the Legislature itself has the power to fix the sales price of all commodities useful to man by declaring an emergency. The first two are lacking in this case and the third is very questionable. This court and the United States Supreme Court have never so decided.

This law, chapter 781, Laws of 1933, is a mere shell, leaving to National bodies or officials the power to make the laws of New York State. To repeat, the Legislature does not declare that any emergency exists in the coal trade as conducted in intrastate commerce. It does not even declare that this business needs regulating. It leaves it entirely to an outside authority to say whether or not it shall be regulated, and what the regulations shall be. It leaves it to a National Code Authority or a National Administrator to say whether the emergency exists in that trade in New York State, and to fix the price at which coal shall be sold. The delegation of its power is even more extreme, for it makes it a misdemeanor for any citizen to violate any rule or regulation hereafter made by these authorities. The only thing required by this law is the filing of the nationalized codes in the Secretary of State's office. To this extent the Legislature has acted, and no further. Everything else has been delegated.

The briefs place much emphasis upon *Nebbia* v. *New York* (291 U. S. 502); *People* v. *Nebbia* (262 N. Y. 259), and claim that this is an authority to sustain legislation fixing the price of any commodity — shoes, clothes, coal, hardware or anything else that may strike the Legislature's fancy, provided an emergency be declared. The fixing of the price of milk in the *Nebbia* case was a mere incident to other regulations which tried to meet an abuse growing up to the detriment of the farmer and his stock. This control of the output protected the very vitals of the industry, and it would not have been a far step to have held, as perhaps it was intimated, that the milk industry

was one touched with a public interest, such as water, electricity, grain and the like. To say that the *Nebbia* case is an authority for the Legislature to fix the prices of all commodities is not justified by the decision. What the legislative power may be in a given case regarding any industry we do not undertake to say. Sufficient unto the day is the power thereof.

Even then the Legislature in this case has made no attempt to fix the price of coal or to appoint any body to investigate as to its necessity. It adopts without ascertaining the facts for itself what may or may not be done by others having interests outside of New York State.

Likewise we have been referred to the cases regulating the rates on railroads, and for electric lights, such as *Matter of Trustees of Village of Saratoga Springs* v. *Saratoga Gas & Elec. L. & P. Co.* (191 N. Y. 123); *People* v. *Long Island R. R. Co.* (134 N. Y. 506); *Matter of Gilbert Elevated Ry. Co.* (70 N. Y. 361); *People ex rel. Doscher* v. *Sisson* (222 N. Y. 387); *Matter of College of City of New York* (236 N. Y. 594); *Cleveland* v. *City of Watertown* (222 N. Y. 159); *Gardner* v. *Ginther* (257 N. Y. 578). All these cases dealt with corporations exercising public franchises or else with political divisions of the State or creatures of the State. They have no application to the price-fixing power generally.

We conclude that this State law which we are reviewing is unconstitutional, as an unauthorized delegation of legislative functions, contrary to our State Constitution.

The New York State Constitution further provides in article III, section 17, as follows: " No act shall be passed which shall provide that any existing law, or any part thereof, shall be made or deemed a part of said act, or which shall enact that any existing law, or part thereof, shall be applicable, except by inserting it in such act."

The evils sought to be avoided by this prohibition were stated in *People ex rel. Commissioners* v. *Banks* (67 N. Y. 568), where the court said: " The evil in view in adopting

this provision of the Constitution, was the incorporating into acts of the legislature by reference to other statutes, or clauses and provisions of which the legislators might be ignorant, and which affecting public or private interests in a manner and to an extent not disclosed upon the face of the act, a bill might become a law, which would not receive the sanction of the legislature if fully understood (p. 575.) "

Surely an act which provided that any regulation of Congress hereafter made when filed with the Secretary of State would be enforceable in this State, and a violation thereof would be a misdemeanor, would be a violation of the spirit and letter of this our constitutional provision. The Codes above referred to, when once approved, are designed to have the effect of the law; they are made law by the act of Congress so far as they affect interstate commerce, and now they are proposed to be made law by incorporating them bodily into our statute by reference. It is too narrow a construction of this wise constitutional provision to say that it only applies to State laws and not to the Codes, because they are not laws in the strict sense of the word. The Codes became laws with heavy sanctions for an infraction. Their embodiment into chapter 781 of the Laws of 1933 by reference was unconstitutional. (*Opinion of the Justices*, 239 Mass. 606; *State* v. *Vino Medical Co.*, 121 Me. 438.) (See, also, *People ex rel. New York Electric Lines Co.* v. *Squire*, 107 N. Y. 593, p. 602; *Matter of Watkinson* v. *Hotel Pennsylvania*, 195 App. Div. 624; affd., 231 N. Y. 562.)

One of the orders below denied defendants' motion to dismiss the complaint. The other order restrained the defendants from carrying out their repeated threats to prosecute the plaintiff for violation of the order of the Divisional Code Authority No. 3, being Order No. 3E. The injunction, if otherwise proper, was equitable, as the accumulation of fines and the discontinuance of the plaintiff's business meant his immediate ruin. The

orders affirmed by the Appellate Division being interlocutory, permission was given by that court to come here, the question certified being:

"Does the complaint herein state facts sufficient to constitute a cause of action?"

The orders of the Appellate Division should be affirmed, with costs, and the question certified answered in the affirmative.

LEHMAN, J. (dissenting). It is common knowledge that in the summer of 1933 conditions had arisen which almost paralyzed many forms of industry and commerce. That constituted a threat to the economic stability of the Nation and of every State; it affected the welfare of the whole people. It is immaterial whether or not we call this condition an "emergency;" it was certainly a condition from which the country urgently needed relief. Congress and the Legislatures of the several States, each within its own field, were under the duty of enacting legislation reasonably calculated to provide a remedy, so far as possible, for these conditions.

The field within which the Congress of the United States was empowered to act was limited to interstate commerce. Exact definition of the limits of that field is difficult, perhaps impossible. The geographical boundaries of the separate States fix the limits of State sovereignty, they form no barriers, and are completely disregarded in the conduct of commerce and industry by business men. The production and sale of commodities conducted by the same men, in the same plant and at the same time may be a part both of interstate commerce and of intrastate commerce. A business localized within a State competes often with interstate commerce. Economic laws ignore State boundaries artificially created to mark the limits of local sovereignty. The steady increase in the proportion of business conducted on a national or at least interstate scale brings interstate business into constantly increasing competition with local business. The Congress

of the United States has, in the National Recovery Act, attempted to provide a method for the formulation of rules and regulations intended to govern such commerce as comes within the field of its power. All Congress can do or has attempted to do is to act within the field of its powers. Only the Supreme Court of the United States can authoritatively define the limits of that field. Outside of that field the statute of Congress can have no effect. There regulation becomes only a matter of State concern and of State powers.

The Legislature of the State of New York, like the Congress of the United States, is impotent to enlarge or restrict the field of its own powers. It knows only that whatever the ultimate definition of the Supreme Court of the United States may be, some field of local intrastate commerce and industry will remain in which the State is the supreme sovereign. The Legislature cannot abdicate within that field, whether it be large or small, the sovereignty of the State. The State of New York, by its Constitution, has intrusted to its Legislature the law-making power. The Legislature cannot delegate to any other person or body the power intrusted to it. It is said that the Legislature has done so in the State Recovery Act. That is the primary question presented upon this appeal.

That question cannot be determined by the application of any set formula. We deal here with no express prohibition or limitation placed by the Constitution upon the powers of the Legislature. The action of the Legislature is challenged upon the ground that it has not exercised the responsibilities and functions intrusted to it, but that it has evaded its responsibilities and confided its own functions to others. That requires an analysis of the problem which confronted the Legislature, and a determination whether the Legislature has in fact devised a remedy reasonably calculated to meet the situation, or has left to others the solution of the problem.

No one can, I think, doubt that conditions existed which were undermining both interstate commerce and local business. Congress took action to remove these conditions in connection with interstate commerce. Within that field Congress is supreme, and a Federal statute becomes the supreme law of the land. That field is, as I have said, not authoritatively defined by the only tribunal that could give an authoritative definition. Assertion was made that Congress could regulate even intrastate, local business upon the theory that under modern conditions intrastate and interstate business are so closely intertwined that regulation of intrastate business is a necessary step in the regulation of commerce between the States. We may reject such assertion; nevertheless a large " twilight zone " must remain in which those who conduct a particular business cannot with certainty determine whether or not they are subject to the provisions of the National Recovery Act. Even if that were not so, it would still be the fact that localized business does come into competition with interstate commerce; that sickness in local business may cause the death of interstate commerce, and, more important, that sound rules regulating either local business or interstate commerce become more effective when applied simultaneously to both.

Thus after Congress had enacted the National Recovery Act, the Legislature was called upon to decide whether the remedy which Congress was seeking to apply to conditions existing in interstate commerce was in its opinion a sound remedy which could be applied also to the same conditions existing in intrastate commerce or industry. Then the Legislature was called upon to determine whether it should adopt the same remedy, including the machinery for the formulation of specific rules and regulations in particular lines of business. It could, if it chose, write its own prescription; it could if it chose create its own administrative machinery, but if it chose such course it would introduce chaos into a situation

which called for order. Businesses which enter into competition with each other would be subject to different rules, regulations and restrictions; indeed, departments of the same business might be subject to different forms of regulation, and a business man might be called upon to decide at his peril to which rules he was subject.

The Legislature chose instead to cooperate with the National Government effectively; to provide that the same regulations and the same machinery applicable in interstate commerce should be applied also in local business within the State. We are not concerned with the wisdom of the National Recovery Act. Upon that there is, undoubtedly, great difference of opinion. We are not even concerned with the wisdom of the Legislature in recognizing that the orderly application of one system of regulation to business, both interstate and intrastate, has advantages over the introduction of artificial differentiations which would weaken any effective regulations, though here there seems less ground for difference of opinion. We are concerned only with the power of the Legislature to make the choice it did.

If there has been any delegation of legislative authority to the President, to representatives of industry or to code authority, that delegation was made by Congress before the Legislature of this State enacted the statute which is now challenged. The Legislature dealt with a condition already existing. If the Federal statute was valid within the field of interstate commerce, then, so the Legislature decided, it should be applied in all business; and even if eventually the Supreme Court should declare the Federal statute unconstitutional, in the interval, and so long as the executive Federal authorities sought its enforcement, there could be no effective regulation by any other system.

What are the powers and the functions of the Legislature under such circumstances within the field where the State is supreme? Obviously, to appraise the conditions, whether created by economic laws, by action of the

Federal authorities, or by greed or unsocial practices of individuals, and then itself to devise the remedy which it deems best calculated to remedy these conditions. That is what the Legislature has done. It has not supinely left to others the determination of such remedy. It has itself determined that the remedy to be tried is the application to business within the State of the same rules and regulations which the Federal authorities apply nationally. It has not delegated to the Federal authorities or to individuals the right to act in its place in the determination of the policy of the State or the remedy to be applied in matters of State concern. It has chosen the policy and formulated the rules by enacting a statute which provides for regulation of intrastate business in the same manner in which interstate business is regulated.

To hold that the Legislature has not the power to choose this course is equivalent to saying that the legislative power of the State is insufficient to make laws best calculated to remedy a particular situation. True, a statute may be subject to successful attack upon the ground that the Legislature violated an express prohibition or express limitation placed upon the exercise of legislative power of the Legislature. Here the attack is on other grounds. The court is holding that the statute is invalid because it is not a complete exercise of the legislative powers of the State, but is merely an authorization conferred upon others to exercise such powers. We are referred to numerous cases as authority for that assertion. They do not support it. They are all cases where the Legislature or Congress deliberately left incomplete even the framework of a regulatory system. Here not only the framework is complete but the system is complete in all its parts. We are told that the statute can be sustained only upon certain assumptions. With the exception, perhaps, of the assumption that price-fixing may, in proper case, be within the legislative power, none of them are, in my opinion, necessary or even relevant. The formu-

lation of regulations in a particular business in accordance with the Federal statute creates the conditions which the Legislature of this State has determined require the application of the same regulations within this State, and thus automatically fixes the rule. The Legislature has not left to others the determination of the policy of the State, or what regulations are wise and are calculated to remedy conditions which might otherwise injuriously affect the public welfare. It has said that, under present conditions and regardless of the wisdom of a particular regulation, the public welfare requires that the same regulations should be applied to interstate and intrastate business.

The rule that the Legislature cannot delegate legislative power is merely an application of the basic rule that the legislative power of the State is vested solely and completely in the Legislature. It is no limitation upon the legislative power of the State. That is plenary in all matters of State concern, except where limited by the Constitution of the State or of the United States. It necessarily includes the power to determine the policy of the State and to make that policy effective. The policy of the State is embodied in the statute which is now attacked. It declares that certain causes affect both intrastate and interstate commerce. It declares that the standards of fair competition should be uniform in intrastate commerce and business and in interstate commerce. That declared policy can be made completely effective only if the State adopts and makes applicable to intrastate industry or commerce the same standards, rules and regulations as are applied in interstate commerce. That is what the Legislature has done. There is no analogy between a statute of that kind and a statute which would authorize the Legislature of a sister State or any other body or person to determine the policy or make the laws for this State. The test in each case must be whether or not the Legislature of this State has itself exercised its constitutional law-making power, or whether it has

evaded its responsibility in that respect. Here the Legislature has completely exercised its powers and has adopted as a means of carrying out the policy of the State the method best calculated, in its opinion, to carry out that policy. The attack upon the method is merely an indirect attack upon the policy of uniform standards in intrastate business and in interstate commerce; though that policy is immune from attack otherwise.

The Legislature has said that " a national emergency productive of widespread unemployment and disorganization of industry, which likewise prevails in the state of New York, which burdens intrastate, interstate and foreign commerce, affects the public welfare, and undermines the standards of living of the American people and of the people of the state of New York, is hereby declared to exist." That finding justifies legislation which is calculated to remove these destructive conditions. The Congress of the United States had previously declared the existence of similar destructive conditions in the Nation The Legislature found that the declaration of Congress as to the causes and effect of existing destructive conditions " relate as well to commerce in this State wholly intrastate in character as to interstate and foreign commerce and transactions affecting interstate and foreign commerce carried on in this state." So far certainly there has been no delegation of legislative authority to the Congress of the United States, or to any other body, or person. The Legislature has used its own judgment in reaching its own conclusion.

That conclusion is that the State should make " uniform the standards of fair competition prevailing in intrastate commerce and industry with those of interstate commerce required by the provisions of the said National Industrial Recovery Act which are applicable in interstate commerce in the State of New York." For that purpose and to carry out that policy, the Legislature provides that any violation of any rule or regulation adopted pursuant

to the National Recovery Act as a standard of fair competition shall be a misdemeanor in this State. The Legislature has not in that provision left to others the determination of the expediency of rules of conduct hereafter to be imposed in a particular trade or industry, or the determination of whether an emergency exists which requires any compulsory rule of conduct. It has determined for itself that industry in general is suffering from a condition which requires remedy; that a remedy applied to local industry alone is not the most expedient remedy, but that whenever a rule or regulation in regard to fair standards of competition is imposed by competent authority upon transactions affecting interstate and foreign commerce carried on within this State, a contingency arises which should be met by the imposition of the same rule or regulation upon business conducted wholly within the State.

We have sustained legislative action in providing that " foreign insurance companies, as the price of admission to our territory, should pay in taxes, license fees and the like precisely what the States which created them should impose upon our companies in excess of our usual rates as the price of admission to the foreign territory." (*People* v. *Fire Association of Philadelphia*, 92 N. Y. 311, 317.) The analogy between such a statute and the statute now under consideration is, of course, incomplete. Significant distinctions are obvious; but similar objections were raised to the validity of the statute and much that was said there applies here. " In the statute before us nothing is left to anybody's discretion. That is certain which can be rendered certain, and the act fixes the tax by reference to an extrinsic fact which determines its amount in excess of a fixed and established rate. Because that extrinsic fact is the legislation of another State, it does not follow that the legislative discretion of such other State is in any manner substituted for our own. * * * It seems to us that the whole difficulty arises from a failure

to regard the foreign law, relatively to our own legislation, as simply and purely an extrinsic and contingent fact. Such fact, like any other, may justly influence and even occasion legislative action, without at all changing its nature, destroying its discretion or abridging its duties or its judgment. Most laws are made to meet future facts. They are complete when passed, but sleep until the contingency contemplated sets them in operation. * * * Such contingency may sometimes be, instead of a certain and definite fact, one which is variable and changeable. The legislation suited to such a fact and adapted to such a future emergency may properly recognize its movable character, and be itself made flexible to the changing emergency, and this very characteristic is the product of legislative will and discretion rather than a surrender of it " (p. 318, 319). Much more is said in the opinion in that case. It would be difficult to find a single proposition in this dissenting opinion which has not been approved by this court in *People* v. *Fire Association of Philadelphia* (*supra*), and there is hardly an argument which could be made to the contrary which was not rejected by this court in the earlier case.

Much of what I have heretofore said applies with at least equal force to the attack upon the statute on the ground that it violates the provision of the Constitution of the State prohibiting incorporation of any existing law or part thereof, by reference, into another act. (Art. III, § 17.) That section of the statute was not intended and cannot reasonably be construed as a limitation upon legislative power but only upon the manner of its exercise. It seems to me too clear to require argument that if the Legislature would otherwise have power to provide that a regulation or rule thereafter to be formulated should become the law of this State, that provision of the Constitution would create no obstacle. By its express terms it is confined to " any *existing law* " and its purpose as explained in *People ex rel. Commissioners* v. *Banks,* (67 N. Y. 568), is similarly limited.

I have not overlooked the fact that there may be doubt whether under the Constitution of the United States, the price-fixing provisions in codes are valid and enforceable regulations in interstate commerce. If they are invalid in interstate commerce, then I concede that they are equally invalid in intrastate business. There should, however, be more than doubt as to their validity before this court would be justified in sustaining a suit in equity to set them aside in the absence of any expression of opinion on the question by the Supreme Court of the United States.

The orders should be reversed.

O'BRIEN, HUBBS and LOUGHRAN, JJ., concur with CRANE, Ch. J., for affirmance; LEHMAN, J., dissents in opinion, in which CROUCH and FINCH, JJ., concur.

Orders affirmed, etc.