STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. HOTEL BAR FOODS, INC., DEFENDANT-RESPONDENT.

STATE OF NEW JERSEY, FELIX SANDRI, WEIGHTS AND MEASURES SUPERINTENDENT, PLAINTIFF-APPELLANT, v. SAFEWAY STORES, INC., DEFENDANT-RESPONDENT.

Argued February 14, 1955—Decided March 21, 1955.

116

*Mr. Ralph L. Fusco*, Deputy Attorney-General, argued the cause for the appellants (*Mr. Grover C. Richman, Jr.*, Attorney-General of New Jersey, attorney; *Mr. Joseph A. Murphy*, Assistant Deputy Attorney-General, on the brief).

*Mr. Elmer J. Bennett* argued the cause for the respondents (*Messrs. Carpenter, Gilmour & Dwyer*, attorneys).

The opinion of the court was delivered by

JACOBS, J.   The respondent Safeway Stores, Inc. was convicted in the Municipal Court of Clifton for violation of *R. S.* 51:1–96; a similar conviction was entered in the Municipal Court of Jersey City against the respondent Hotel Bar Foods, Inc.   On appeals duly taken, the Safeway Stores conviction was reversed in the Passaic County Court and the Hotel Bar Foods conviction was reversed in the Hudson County Court. Thereafter the State filed separate notices of appeal to the Appellate Division and they were consolidated in that court. We granted certification under *R. R.* 1:10–1(*a*).

The facts in the *Safeway* case as found in the County Court were as follows:   The Clifton Superintendent of Weights and Measures visited a Safeway retail grocery store located at 385 Lakeview Avenue and weighed packages of butter which were labeled to show the net weight of one pound.   One had a net weight of one-fourth of an ounce less than the stated net weight, another had a net weight of three-eighths of an ounce less than the stated net weight, and some weighed "one pound net or more."   The butter had been packaged for and delivered to Safeway "f. o. b. railway freight car at Chicago, Illinois, and was promptly shipped to New Jersey by rail in interstate commerce."   At the time the butter was packaged and shipped "the average net weight of each package was at least one pound, one-eighth ounce." While at the Safeway store the Clifton superintendent also weighed packages of beans which were labeled to show the net weight of one pound.   Two of the packages had a net weight of one-half ounce less than the stated net weight, one of the packages had a net weight of one-fourth ounce less

than the stated net weight, and some of the packages "weighed one pound net or more." The beans had been packaged at Saginaw, Michigan, and were sold to Safeway "f. o. b. railway freight car at Saginaw," and were promptly shipped to Safeway in New Jersey by rail in interstate commerce. At the time the beans were packaged and shipped "the average net weight of each package in the shipment was at least one pound, one-eighth ounce."

The facts in the *Hotel Bar Foods* case as found in the County Court were as follows: An assistant superintendent of weights and measures of the City of Jersey City visited a retail grocery store at 212 Washington Street where he took 15 packages of butter bearing the label "Hotel Bar Butter, 1-lb. Net, Distributed by Hotel Bar Butter Co., N. Y." He found that they each weighed one pound gross, including the wrapping. The dry weight of the wrapping "was between one-fourth and three-eighths of an ounce." Although the County Court did not embody it in its findings of fact, there was testimony establishing that Hotel Bar Butter is packaged at the company's New York plant by modern machines which are set at one-eighth above the pound to provide for normal shrinkage through evaporation.

The sole offenses actually charged in the complaints filed against Safeway and Hotel Bar were alleged violations of *R. S.* 51:1–96; the County Courts held that statute to be inapplicable to packaged food such as that sold by Safeway and Hotel Bar. They expressed the view that the applicable and controlling statute was *R. S.* 51:1–29 which provides specifically that no person shall possess or sell "any article of food in package form" unless the net quantity of the contents be plainly and conspicuously marked on the outside of the package in terms of weight, measure or numerical count. That statute, however, provides that "Reasonable variations, tolerances and exemptions as to small packages shall be permitted"; the County Courts found that the State Superintendent of Weights and Measures had "not fixed any tolerances for, or deviations from, stated label weight of food in package form."

The original source of *R. S.* 51:1–96 was *chapter* 201 of the *Laws of* 1911. That was entitled "An Act to establish a uniform standard of weights and measures in this State, to establish a department of weights and measures, and to provide penalties for the use of other than standard or legal weights and measures." See *Const.* 1947, *Art.* IV, *Sec.* VII, *par.* 4. The history and terms of the act indicate that the problem then being dealt with was one of false weighing and measuring apparatuses. As expressed in the 1912 *Report of the Department of Weights and Measures* (at *page* 5): "incorrect instruments and appliances were sold to dealers" and honest merchants "found they could meet their competitors in everything save that of short weighing and measuring." Food was then generally sold from bulk and purchasers were dependent on the accuracy of the scales and measures and the integrity of the individual retailers. The 1911 act prescribed the standards of weights and measures and directed the state superintendent to fix tolerances of at least one-half of one per cent. *L.* 1911, *c.* 201, *p.* 424. In section 26 it provided that any person who injures or defrauds another by use of "a false weight, measure or other apparatus, for determining the quantity of any commodity, or article of merchandise, or sells or exposes for sale less than the quantity he represents" should be guilty of a misdemeanor. Although the latter language was very broad in scope it would seem clear that the Legislature did not at that time envision the later developments which encompassed the widespread retail sale of packaged food without any accompanying weighing or measuring.

In the 1914 *Report of the Department of Weights and Measures,* the State Superintendent referred to a net weight container bill which had been introduced in the Legislature and which required that food in package form bear labels setting forth the net weight, numerical count or measure. In support of the bill, he made the following comments (at *page* 12):

"The preference these days seems to be in favor of package goods, notwithstanding they cost more than goods in bulk. There is not

much difference in the quality usually. It costs to place foodstuffs in packages. Then there is the advertising to be considered and the giving of premiums, both of which are necessities that cannot be dispensed with. Manufacturers, to realize on their investments, must get a higher price for their goods and reduce the contents of the packages. This course has been uniformly followed, with the result that today we pay more and get less when buying package goods. There is no doubt upon this point. After considering the matter, we are of the opinion that people want package goods—they're cleaner. Since they want them, let them have them, but,—first, let them see what they are paying for and getting—that is what our Net Weight Container bill seeks to bring about. Most of the large manufacturers mark the weight of contents on their packages; some others make no reference on their packages to weight of contents. The bill we have presented will place competition on a fairer basis. If enacted, it will eliminate confusion and dissatisfaction among manufacturers and it will save the housewife money. New York and Pennsylvania have similar laws in operation and in both states conditions have been materially improved."

The bill was not passed and the recommendation for its enactment was renewed by the state superintendent in the 1915 *Report of the Department of Weights and Measures* (at *page* 11) :

"Recommendations.—While it is true that we have been able to bring about improved conditions, because of our law being one of the best, there yet remains room for improvement in our law. Additional legislation is needed if we are to cope with the everchanging conditions of the times. The Legislature of 1915 failed to pass our Net Weight Container law. It was explained to us that the bill had met with opposition sufficiently strong to block its passage. This is to be regretted because a Net Weight Container law is needed urgently.

We are so firmly convinced that such a law is necessary that we have introduced another bill this year, similar in purport to the bill of last year. It requires manufacturers of food stuffs placed in packages to mark the net weight, measure or numerical count on the outside of their packages. This is not a drastic bit of legislation and many manufacturers outside of New Jersey already follow out the recommendations in our bill; some other manufacturers—both in and out of the State—do not mark their packages. Our law would apply to all and would prove of great benefit to housewives. Dealers, too, would be benefited because competition would be placed on a more equitable basis and confusion would be eliminated. If the Legislature's members could be made to realize the importance of the bill introduced they would not hesitate about passing it."

In 1916 the Legislature enacted *chapter* 181 of the *Laws of 1916*. The introducer's statement set forth that its object was to require packers of food to mark the net weight, measure or numerical count and that it was "in harmony with the Federal Law as regards marking, allowable deviations and tolerances." It may be noted that at that time the federal act required that the packaged food bear the weight measure or numerical count, provided, however, that "reasonable variations shall be permitted, and tolerances and also exemptions as to small packages shall be established by rules and regulations." See 21 *U. S. C. A.*, § 10. *Cf.* 21 *U. S. C. A.*, § 343; 21 *C. F. R.*, § 1.8 (1953). In *United States v. Shreveport Grain & Elevator Co.*, 287 *U. S.* 77, 53 *S. Ct.* 42, 43, 77 *L. Ed.* 175 (1932), the court construed the aforementioned proviso "as giving administrative authority to the Secretaries of the Treasury, Agriculture, Commerce, and Labor to make rules and regulations permitting reasonable variations from the hard and fast rule of the act and establishing tolerances and exemptions as to small packages." *Chapter* 181 of the *Laws of* 1916 contained provisions that "reasonable variations and tolerances and exemptions as to small packages shall be permitted" and that the state superintendent shall fix "such tolerances and exemptions as to small packages as shall have been or may hereafter be fixed by the Secretary of the Treasury and the Secretary of Agriculture and the Secretary of Commerce and Labor of the United States of America, and such tolerances and exemptions shall be published at the end of the session laws" of 1916. In *chapter* 47 of the *Laws of* 1918 the Legislature directed that publication at the end of the session laws of 1918 should have the same force and effect as though made in 1916; pursuant to this enactment the exemptions on small packages were published at the end of the *Laws of* 1918 (at *page* 1279).

In the 1916 *Report of the Department of Weights and Measures* (at *page* 8) the state superintendent had the following to say with respect to *chapter* 181 of the *Laws of* 1916 which had then been in effect for several months:

"Briefly, the Net Weight Law, which has been in operation since the first of October, requires manufacturers of foodstuffs in packages to mark the net weight, measure or numerical count on the outside of the package. In other words, it forbids manufacturers to 'weighin' wrappings, cartons, paper, etc. Consumers buying foodstuffs in package form to-day—and thousands never purchase in any other way—know just the quantity that they are getting for their money. They were not certain before. The act has been in operation only a short time, but its effects are already markedly beneficial. Ultimately, it will save consumers thousands of dollars, because the tendency to-day leans more and more to the sale of foodstuffs in packages. It means much to housewives to be able to see at a glance just what they are getting for their money. Already there are all kinds of teas, coffees, butter, sugar, dried fruits and vegetables—such as beans and peas—and many other articles sold in package form. Under the Net Weight Law manufacturers must mark just what quantity is contained in the package. Merchants, too, share in the benefits of the act. It makes competition fairer and does away with the fraud that was formerly practiced.

There is no legitimate objection to the sale of food in package form. The plan has a number of advantages, chief of which must be mentioned its being sanitary. Eventually, in our opinion, most articles of food will be sold in the form of packages. The innovation may not come for a few years, but there are many evidences now pointing to the time when the method will be generally adopted. When the time does come for food to be sold exclusively in package form, our law will effectually take care of the situation."

When the *Revision of* 1937 was adopted it contained provisions which carried forth the original purposes of *section* 26 of *chapter* 201 of the *Laws of* 1911 and *chapter* 181 of the *Laws of* 1916; the intervening amendments are not particularly pertinent. See *L.* 1913, *c.* 194; *L.* 1918, *c.* 11; *L.* 1919, *c.* 214; *L.* 1921, *c.* 95. *Cf. L.* 1919, *c.* 197; *L.* 1921, *c.* 91; *L.* 1953, *c.* 48. The substance of *chapter* 181 of the *Laws of* 1916 is now found in *R. S.* 51:1–29 which provides that no person shall distribute or sell or have in his possession "any article of food in package form" unless the net quantity be marked on the outside of the package in terms of weight, measure or numerical count. The marking must be accurate subject to minor allowances—the statute expressly directs that "reasonable variations, tolerances and exemptions as to small packages shall be permitted." We reject the State's contention that this statutory direction has no relation to packages other than those defined as "small

packages"; on the contrary, the terms of the statute clearly indicate that "reasonable variations" are to be permitted with respect to packages which are not exempt and the legislative history removes all doubts as to the soundness of this conclusion. See *United States v. Shreveport Grain & Elevator Co., supra.* The Superintendent never adopted any regulations pursuant to the statutory direction that reasonable variations be permitted although there has been no obstacle to their promulgation at any time. It may be noted that the federal regulation directs, in part, that "variations from the stated weight or measure shall be permitted when caused by ordinary and customary exposure, after the food is introduced into interstate commerce, to conditions which normally occur in good distribution practice and which unavoidably result in change of weight or measure." 21 *C. F. R., supra,* § 1.8(k)(1). See also 21 *C. F. R., supra,* § 1.8(k)(2). Although the superintendent might readily adopt and apply a similar regulation in the interests of federal-state uniformity we assume, for present purposes, that he would be under no constitutional compulsion to do so if he reasonably concludes that more precise definition and regulation are necessary for the protection and welfare of our people. See *Savage v. Jones,* 225 *U. S.* 501, 32 *S. Ct.* 715, 56 *L. Ed.* 1182 (1912); *P. F. Peterson Baking Co. v. Bryan,* 290 *U. S.* 570, 54 *S. Ct.* 277, 78 *L. Ed.* 505 (1934). *Cf. The Pennsylvania Railroad Co. v. Department of Public Utilities,* 14 *N. J.* 411, 425 (1954); *Cloverleaf Butter Co. v. Patterson,* 315 *U. S.* 148, 62 *S. Ct.* 491, 86 *L. Ed.* 754 (1942). Our statute deliberately omits any requirement that the federal regulation as to *variations* be adopted although it does contain a mandatory direction that the state superintendent fix "such *tolerances and exemptions as to small packages* as shall have or may hereafter be fixed by the secretary of the treasury, the secretary of agriculture and the secretary of commerce of the United States of America." Subsequent federal legislation has transferred the pertinent authority from the named secretaries to the Secretary of Health, Welfare and Education. See 21 *U. S. C. A.,* § 301 *et seq.*

The State contends that this particular mandatory direction is invalid as an improper delegation by our Legislature of its law-making power to federal officials, citing *Wilentz v. Sears Roebuck & Co.*, 12 *N. J. Misc.* 531 (*Ch.* 1934); *State v. Larson*, 10 *N. J. Misc.* 384 (*Oyer & Term.* 1932); *Hutchins v. Mayo*, 143 *Fla.* 707, 197 *So.* 495, 133 *A. L. R.* 394 (1940); *State v. Intoxicating Liquors*, 121 *Me.* 438, 117 *A.* 588 (1922); *Holgate Bros. Co. v. Bashore*, 331 *Pa.* 255, 200 *A.* 672, 117 *A. L. R.* 639 (1938); *Darweger v. Staats*, 267 *N. Y.* 290, 196 *N. E.* 61 (1935). The respondents advance a contrary point of view, citing *Commonwealth v. Alderman*, 275 *Pa.* 483, 119 *A.* 551 (1923); *Swetland v. Curtiss Airports Corporation*, 41 *F. 2d* 929 (6 *Cir.* 1930), modified 55 *F. 2d* 201 (6 *Cir.* 1932); *Commonwealth v. Warner Bros. Theatres*, 345 *Pa.* 270, 27 *A. 2d* 62 (1942); *Alaska Steamship Co. v. Mullaney*, 180 *F. 2d* 805 (9 *Cir.* 1950).

█ Although the early decisions generally spoke in prohibitory terms, it is now established that legislative delegations are permissible so long as they are accompanied by sufficient basic standards. See *State Board of Milk Control v. Newark Milk Co.*, 118 *N. J. Eq.* 504, 522 (1935); *New Jersey Bell Tel. Co. v. Communications Workers, etc.*, 5 *N. J.* 354, 370 (1950); *Ward v. Scott*, 11 *N. J.* 117, 123 (1952). The exigencies of modern government have increasingly dictated the use of general, rather than minutely detailed standards and they have, for the most part, received the approval of our courts. See *State Board of Milk Control v. Newark Milk Co., supra; New Jersey Bell Tel. Co. v. Communications Workers, etc., supra; Ward v. Scott, supra.* Cf. *Borough of Little Ferry v. Bergen County Sewer Authority*, 9 *N. J.* 536, 544 (1952); *Family Finance Corp. v. Gaffney*, 11 *N. J.* 565, 576 (1953). When dealing with special fields which are primarily the subject of federal regulation, our Legislature has wisely guided its administrative agencies towards the adoption of conforming regulations. Thus in *R. S.* 6:1–29 the State Aviation Commission was authorized to adopt rules and regulations with the direction that they

"shall be kept in conformity as nearly as may be with the laws, rules and regulations of the United States Government concerning aeronautics." But *cf. State v. Larson, supra.* In *R. S.* 43:21–11 the Unemployment Compensation Commission was directed to cooperate "to the fullest extent consistent with the provisions of this chapter" with the Social Security Board created by federal legislation. In *R. S.* 24:2–1 the State Department of Health was authorized to adopt, insofar as applicable, the "regulations from time to time promulgated by the Secretary of Agriculture of the United States under the Federal Act." See also *R. S.* 24:1–4; *R. S.* 24:5–2; *R. S.* 24:5–8; *R. S.* 24:5–18; *R. S.* 24:6–1; *R. S.* 24:11A–7; *R. S.* 24:11A–8; *R. S.* 26:2–60.

█ It may be noted that in these instances the state administrative agency retains at least a miniscule measure of discretion whereas in *R. S.* 51:1–29 the Superintendent is flatly directed to adopt such "tolerances and exemptions as to small packages as shall have been or may hereafter be fixed" by the federal officials. Realistically viewed, the distinction seems insubstantial and hardly sufficient to determine basic issues of constitutionality. The ultimate and controlling policy decision—as to whether there shall be uniformity of federal-state regulation in the field—rests always with the Legislature and it does not in any vicious sense abdicate its legislative judgment or authority. *Cf. Jaffe, An Essay on Delegation of Legislative Power,* 47 *Col. L. Rev.* 561, 564 (1947). In its effort to achieve uniformity the Legislature may adopt federal laws and regulations then in effect without setting them forth in detail in the state enactment. See *Eggers v. Kenny,* 15 *N. J.* 107, 124 (1954); *Jersey City v. Martin,* 127 *N. J. L.* 18, 24 (*E. & A.* 1940). But unless the Legislature may also, in the same enactment, provide suitably for the State's immediate adoption of amendments to the federal laws and regulations, the State's policy of uniformity would, as a practical matter, soon be defeated. See *Alaska Steamship Co. v. Mullaney, supra,* 180 *F. 2d,* at *page 822,* where the court aptly remarked that delegations "must be judged in the light of what is practical." Although

the authorities are in substantial conflict, there are reasoned decisions which tend to support the view (so highly desirable for current times) that a state legislature, in dealing with products such as packaged foods (which generally travel in interstate commerce and are properly subject to extensive federal regulation), may constitutionally provide that its administrator's regulations shall be brought into conformity with pertinent federal regulations as they are duly promulgated and amended from time to time. See *People v. Sell,* 310 *Mich.* 305, 17 *N. W.* 2d 193 (1945); *Commonwealth v. Alderman, supra; Ex parte Lasswell,* 1 *Cal. App.* 2d 183, 36 *P.* 2d 678 (1934). But *cf. State v. Intoxicating Liquors, supra; City of Cleveland v. Piskura,* 145 *Ohio St.* 144, 60 *N. E.* 2d 919 (1945). See also *R. S.* 24:5-2; *R. S.* 24:5-8(d); *R. S.* 24:5-18(g); *R. S.* 24:6-1. In *People v. Sell, supra* [310 *Mich.* 305, 17 *N. W.* 2d 199], the Michigan Supreme Court sustained a Detroit ordinance which apparently permitted municipal prosecutions for violations of federal price regulations as amended from time to time. In the course of his opinion Chief Justice Starr stated that the courts had "upheld many State laws which adopted Federal standards and regulations or which were designed to augment the enforcement of Federal laws or regulations" and that many states had recognized the "necessity and propriety of a mergence of action and reciprocity of service for the common good between the two sovereign powers, the State and the Federal government." The Chief Justice cited with approval and quoted extensively from a Note in 33 *Mich. L. Rev.* 597 (1935) where the author said:

"Certainly it is true that it has been a common practice for the states to adopt federal administrative determinations in fields where the national and state governments have pursued a common policy. A number of states have passed laws adopting either in whole or in part the provisions of the Migratory Bird Treaty Act and the regulations thereunder. Several states in the enactment of narcotic laws have adopted some of the standards prescribed by administrative officers under the Federal Narcotic Laws. Federal standards prescribed under the Pure Food and Drug Act have been adopted by a number of states. The license and bond requirements governing warehousemen qualifying under the Federal Warehouse Act have

been adopted by a considerable group of states. Likewise there has been a widespread adoption by states of federal grain standards under the Grain Standards Act and of federal vegetable and fruit-grading standards. Some states in the oil-producing regions have provisions in their conservation statutes adopting and making automatically effective the rules and regulations of the Department of the Interior. A most interesting development has taken place in the field of aviation law: a majority of states require pilots to be licensed and aircraft to be registered in accordance with the federal regulations concerning these matters, and some have adopted in addition the Federal Air Rules. Occupying a separate category but likewise illustrating in a very effective way the principle of adoption by the states of existing federal legislative policies and prospective administrative determinations thereunder are the co-operative efforts of the federal and state governments under the so-called Federal Aid legislation whereby the federal government makes grants-in-aid to the states, provided the states match the federal grants and accept the terms upon which they are offered. By means of this device the federal government has induced the states to accept federal policies and standards with respect to such matters as forest fire prevention, the organization and training of the militia, agricultural extension work, the construction and maintenance of improved highways, vocational education, vocational rehabilitation, the organization and maintenance of employment bureaus, and, at one time, the treatment of venereal diseases and instruction in the hygiene of maternity and infancy. In all of these there is an adoption of both existing and prospective federal administrative determinations under existing federal legislation."

See Note, *State Legislation Adopting Federal Standards*, 23 *Col. L. Rev.* 674 (1923); Note, *State Legislation in Support of the N. I. R. A.*, 34 *Col. L. Rev.* 1078 (1934); Note, *Adoption by or under Authority of State Statute without Specific Enactment or Re-enactment of Prospective Federal Legislation or Federal Administrative Rules as Unconstitutional Delegation of Legislative Power*, 133 *A. L. R.* 401 (1941).

▮▮▮ In any event, we need not pursue the issue further since we are satisfied that even if the provision in question were deemed unconstitutional the remainder of the statute would properly stand as severable. *R. S.* 1:1–10; *Lane Distributors, Inc. v. Tilton*, 7 *N. J.* 349, 370 (1951). In the instant matter the State did not seek to prosecute the respondents under *R. S.* 51:1–29 and since the superintendent had neglected to prescribe any "reasonable variations" it may be assumed that such prosecutions, if they had been insti-

tuted, would have failed. The State contends, rather, that *R. S.* 51:1–96 is applicable; that no variations whatever were permitted or required under that statutory provision (*cf. Burns Baking Co. v. Bryan*, 264 *U. S.* 504, 44 *S. Ct.* 412, 68 *L. Ed.* 813 (1924)); and that the County Courts erred in their holdings that the prosecutions against the respondents under that statutory provision were not maintainable upon the factual showings made. *R. S.* 51:1–96 provides that any person who injures or defrauds another by using "a false weight, measure or other apparatus for determining the quantity of any commodity or article of merchandise, or sells or exposes for sale less than the quantity he represents" shall be subject to the penalty prescribed. It is part of the 1937 *Revised Statutes*, as is *R. S.* 51:1–29, and both statutes are to be interpreted and given fair effect in the full light of their highly elucidative history. Thus considered, it seems entirely clear that the legislative intent was to deal with the retail sale of packaged food received from out-of-state or in-state manufacturers or wholesale distributors under *R. S.* 51:1–29 rather than under *R. S.* 51:1–96. In the first place, the former deals specifically with the matter whereas the latter, at best, deals with it only generally. See *Hackensack Water Co. v. Division of Tax Appeals*, 2 *N. J.* 157, 165 (1949), where Justice Oliphant approved the general rule of statutory construction that "where there is any conflict between a general and specific statute covering a subject in a more minute and definite way the latter will prevail over the former and will be considered an exception to the general statute." See also *Ackley v. Norcross*, 122 *N. J. L.* 569, 572 (*Sup. Ct.* 1939), affirmed 124 *N. J. L.* 133 (*E. & A.* 1940); *Goff v. Hunt*, 6 *N. J.* 600, 607 (1951). In the second place, the source of the more specific statute (*L.* 1916, *c.* 181) was later in time and was passed to take care of the particular problem which the Legislature presumably had not dealt with earlier. We incline to the view that the 1911 statute (*L.* 1911, *c.* 201) did not contemplate prosecutions for misbranding of packaged food; even assuming, however, that it did, it was to that extent superseded by the 1916

statute which dealt specifically with the subject and justly included express provision for "reasonable variations." This view does not in any wise infringe upon the settled doctrine that repeals by implication are not to be favored. *Henninger v. Board of Chosen Freeholders of County of Bergen,* 3 *N. J.* 68, 71 (1949); *Goff v. Hunt, supra; Hartman v. Board of Chosen Freeholders,* 127 *N. J. L.* 170, 174 (*Sup. Ct.* 1941). The doctrine is simply an aid towards ascertaining legislative intent and is never invoked to defeat it; we are convinced that the legislation now in effect requires that the superintendent first prescribe reasonable variations and thereafter enforce the marking provisions applicable to packaged food under *R. S.* 51:1–29. This was not done in the instant matter and the County Courts therefore rightly reversed the convictions which had been entered in the municipal courts.

Affirmed.

VANDERBILT, C. J., and WACHENFELD, J., concurring in result.

*For affirmance*—Chief Justice VANDERBILT, and Justices OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN— 6.

*For reversal*—None.