COTY, INC., OF NEW YORK, Plaintiff, *v.* HEARN DEPARTMENT
STORES, INC., Defendant.

Supreme Court, Special Term, New York County, November 25, 1935.

*Olvany, Eisner & Donnelly,* for the plaintiff.

*Jay Leo Rothschild,* for the defendant.

ROSENMAN, J. The plaintiff moves for an injunction *pendente lite.* The defendant moves for judgment on the pleadings. Both motions raise the question of the constitutionality of a portion of section 2 of chapter 976 of the Laws of 1935, commonly known as the " Fair Trade Act." The statute is set forth at length as follows:

" Section 1. Subdivision 1. No contract relating to the sale or resale of a commodity which bears, or the label or content of which bears, the trade mark, brand, or name of the producer or owner of such commodity and which is in fair and open competition with commodities of the same general class produced by others shall be deemed in violation of any law of the State of New York by reason of any of the following provisions which may be contained in such contract:

" (a) That the buyer will not resell such commodity except at the price stipulated by the vendor.

" (b) That the vendee or producer require in delivery to whom he may resell such commodity to agree that he will not, in turn, resell except at the price stipulated by such vendor or by such vendee.

" 2. Such provisions in any contract shall be deemed to contain or imply conditions that such commodity may be resold without reference to such agreement in the following cases:

" (a) In closing out the owner's stock for the purpose of discontinuing delivering any such commodity.

" (b) When the goods are damaged or deteriorated in quality, and notice is given to the public thereof.

" (c) By any officer acting under the orders of any court.

" § 2. Wilfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract entered into pursuant to the provision of section one of this act, whether the person so advertising, offering for sale or selling is or is not a party to such contract, is unfair competition and is actionable at the suit of any person damaged thereby.

" § 3. This act shall not apply to any contract or agreement between producers or between wholesalers or between retailers as to sale or resale prices.

" § 4. The following terms, as used in this act, are hereby defined as follows: ' Producer ' means grower, baker, maker, manufacturer or publisher. ' Commodity ' means any subject of commerce.

" § 5. If any provision of this act is declared unconstitutional it is the intent of the legislature that the remaining portions thereof shall not be affected but that such remaining portions remain in full force and effect.

" § 6. This act shall take effect immediately."

The action is for an injunction. The defendant resists the temporary injunction, and seeks by its motion to dismiss the complaint for insufficiency, on the ground that the statute which forms the basis of the complaint is unconstitutional and void. The other grounds urged by the defendant in opposition to temporary injunctive relief need not be considered in view of the conclusions here reached.

No attack is made upon section 1 of the statute but solely upon section 2, as it is applicable to the defendant.

The complaint alleges that the plaintiff is the owner of a business and good will in this State, associated with the sale of certain perfumes, toilet preparations and cosmetics, all of which bear the trade-mark, brand, or label " Coty; " that the plaintiff's products are in fair and open competition with commodities of the same general class produced by others; that the plaintiff has established its good will by the expenditure of large sums of money on advertising and sales promotion; that, pursuant to chapter 976 of the Laws of 1935, above set forth, the plaintiff has entered into standard contracts with more than 3,000 retailers in this State by which the said retailers agreed that they would not resell the plaintiff's products in this State except at the prices stipulated in such agreements. The plaintiff further alleges that the defendant, operating a department store, has refused to enter into a similar contract, although an opportunity was offered to it to do so; that the defendant knows of the existence of the contracts between the plaintiff

and these other retailers, and was, in fact, specifically notified by the plaintiff of the plaintiff's price lists and subsequent changes therein. The complaint further alleges that the defendant, with such knowledge, has advertised for sale, and has sold, the plaintiff's branded products at prices below those fixed in the contracts between the plaintiff and its contracting retailers, and continues to do so in spite of the plaintiff's demand that it desist. Facts are set forth showing that the exceptions in the statute specified in subdivision 2 of section 1 are not applicable. The complaint alleges the conduct of the defendant is in clear violation of section 2 of the statute; that as a result thereof many of the retailers with whom the plaintiff has contracted are threatening to break their contracts; and that the plaintiff's business and good will will be irreparably damaged. The relief sought is to enjoin the defendant from continuing such advertising and sales of the plaintiff's products at prices below the contracts entered into between the plaintiff and other retailers.

In view of the fact that the defendant has not made any agreement with the plaintiff, the validity of section 1 of the statute, legalizing resale price maintenance agreements, is not called into question. The constitutional question presented is whether section 2 of the statute is valid in compelling the defendant, who did not enter into such a resale price maintenance agreement, to maintain the prices fixed in the agreements entered into by the plaintiff and other retailers, strangers to it. Since there is no allegation to the contrary, it must be assumed that the actual commodities being sold by the defendant were never themselves the subject of a price maintenance agreement; *i. e.*, that they do not constitute the very goods which were previously sold under a fair trade contract.

Section 5 of the act makes it possible to determine the constitutionality of section 2, in so far as it applies to this defendant, without affecting the validity of the balance of the statute. Section 2 is here claimed to be unconstitutional only in so far as it affects persons who are not parties to such contracts.

Although there is no legislative finding in the statute, and although it does not appear that the Legislature made any official investigation into any of the conditions which are claimed to have given rise to the legislation, the court, from the various books, articles, and other literature connected with the subject, may reasonably infer that the purpose of the legislation was to prevent certain evils which the Legislature deemed to exist in a system of free and unrestricted competition in branded merchandise. The statute was apparently leveled against the practice of price-cutting, particularly in extensively advertised branded articles, with consequent economic loss to the manufacturer, to competing retail

merchants who do not engage in such practice, and, allegedly, to the consuming public at large. This practice includes the use of so-called " loss leaders," which, in general terms, may be defined as articles, usually trade-marked and well advertised, which a retailer sells at a loss in order to induce prospective purchasers to come to his premises to buy; the loss being voluntarily sustained in the expectation that the prospective purchaser may be induced to buy other products for sale at sufficiently high prices to compensate the retailer for the loss sustained on the " loss leader."

The statute attempted, seemingly, to accomplish two major results: *First,* it definitely legalized any agreement for the sale of a commodity between a producer and a retailer, forbidding the retailer to sell the commodity at a price other than the one stipulated by the producer. *Second,* in order to compel compliance with such fixed resale price upon those who refused to sign such agreements, the statute sought to prevent any one, whether a party to such a contract or not, to sell the commodity at less than the price stipulated in any contract entered into pursuant to the first provision of the act. It is the second effort which is here claimed to be futile on constitutional grounds.

While a substantial amount of modern economic literature condemns the practice of general price-cutting and the continuance of " loss leader " policies as leading to widespread damage to the producers, retailers and, ultimately, to the general public, this view is by no means unopposed. There is substantially equal authority of learned opinion to the effect that the evils of resale price maintenance far outweigh its advantages, and that the result of it is great loss to the community at large, and particularly to consumers who, of course, initially, are compelled to pay a much higher price than a free system of competition would impose upon them.

It is no function of the court to choose between these economic views. The Legislature of this State has adopted the former. The wisdom of its choice is no concern of the judiciary. The fact that the court disagrees with the economic soundness of the legislation would be no ground for declaring it invalid. Conversely, the fact that the court agrees with the economic conclusion reached by the Legislature would provide no reason for sustaining it if it is contrary to the fundamental law of the land as found in the State or Federal Constitution. (*Nebbia* v. *New York,* 291 U. S. 502; 54 S. Ct. 505; 78 L. Ed. 940; 89 A. L. R. 1469.)

The defendant contends that section 2, as applicable to it, is unconstitutional as depriving it of its property and its freedom of contract without due process of law, in violation of article 1, section 6, of the Constitution of the State of New York, and Fourteenth Amendment of the Federal Constitution.

Its contention is that other parties, *i. e.*, the producer and other retailers, have between them fixed prices for various commodities, that it has refused to become a party to such agreements, but that the statute compels it to accept the price schedule which these strangers to it have adopted. It must be conceded at the outset that, irrespective of the ultimate aim of the statute, its immediate effect is to fix prices upon all retailers, not by agreement, but by operation of law.

It is no longer reasonably contended by any one that any citizen has an absolute right to exercise a free and untrammeled dominion over his property or business without the power of the State to regulate its use or conduct to some extent. The constitutional provisions here urged have been the subject of judicial construction for the major part of a century. It is impossible to find in any judicial decision an all-embracing rule or guide as to the exact point to which one may go in the use of his property or the conduct of his business without being burdened by State regulation.

The courts have not attempted to prejudge situations which might give rise to certain types of legislation. The constitutional barriers protecting private property and private business have been the object of repeated attacks by State and Federal legislative bodies. Some assaults have resulted in the opening of breaches in the barriers by the courts. Others have been repulsed. Each attempted invasion has been adjudged on its own facts. If found unjustified, the due process clause has served as a shield; where justification has been established, protection has been found lacking.

The conflict is ever present. Normally the use of property and the execution of contracts are of private concern. In general it may be stated that both are free from governmental interference. But government, in self-protection, may regulate private rights to prevent harm to itself and its citizens. As was said in *Nebbia* v. *New York* (291 U. S. 502, at p. 524; 54 S. Ct. 505, 510; 78 L. Ed. 940; 89 A. L. R. 1469), after stating this general principle: " These correlative rights, that of the citizen to exercise exclusive dominion over property and freely to contract about his affairs, and that of the State to regulate the use of property and the conduct of business, are always in collision. No exercise of the private right can be imagined which will not in some respect, however slight, affect the public; no exercise of the legislative prerogative to regulate the conduct of the citizen which will not to some extent abridge his liberty or affect his property."

The question to be determined in this case, as in other cases where State regulation is challenged under these constitutional

provisions, is whether the circumstances " vindicate [it] as a reasonable exertion of governmental authority or condemn it as arbitrary or discriminatory." The fact that the regulation in question is concerned with price-fixing does not remove it from the general rule. (*Nebbia* v. *New York, supra.*)

The question of price-fixing has, on many occasions, been presented to the Supreme Court of the United States. In the various cases presented for decision different conclusions were reached. Different facts existed in the various cases presented. No general principle can be enunciated as to the constitutionality of price-fixing statutes.

It can be stated, however, that there is no case of controlling authority upholding the right of any State to fix prices of general commodities at times which are not declared to be emergencies.

As was said in the unanimous opinion in *Wolff Packing Co.* v. *Court of Industrial Relations of State of Kansas* (262 U. S. 522, 537; 43 S. Ct. 630, 633; 67 L. Ed. 1103; 27 A. L. R. 1280): " It has never been supposed, since the adoption of the Constitution, that the business of the butcher, or the baker, the tailor, the wood chopper, the mining operator or the miner was clothed with such a public interest that the price of his product or his wages could be fixed by State regulation. * * * Nowadays one does not devote one's property or business to the public use or clothe it with a public interest merely because one makes commodities for, and sells to, the public in the common callings of which those above mentioned are instances." (Quoted in *Ribnik* v. *McBride*, 277 U. S. 350, 356; 48 S. Ct. 545, 546; 72 L. Ed. 913; 56 A. L. R. 1327.)

If it is possible to classify the kinds of cases in which price-fixing statutes have been upheld, they may be divided into three classes: *First*, those where the commodities were " affected with a public interest " or " devoted to a public use," *i. e.*, so intimately bound up with the public interest or public welfare that the industry itself and the prices charged therein are subject to control for the public good; *second*, instances where the State has determined that the public health, morals, safety or welfare (generally included within the objects of its " police power ") depend upon the maintenance of fixed prices; *third*, instances where prices of commodities other than those included in the first two are fixed by reason of a compelling emergency which justifies such interference by the State.

Within the first class are included such cases as *Munn* v. *Illinois* (94 U. S. 113; 24 L. Ed. 77) (rates for storage in grain elevators); *German Alliance Insurance Co.* v. *Lewis* (233 U. S. 389; 34 S. Ct. 612; 58 L. Ed. 1011; L. R. A. 1915C, 1189) (insurance business). Within the second and third classifications are included cases such

as *People ex rel. Durham Realty Corporation* v. *La Fetra* (230 N. Y. 429); *Brown Holding Co.* v. *Feldman* (256 U. S. 170; 41 S. Ct. 465; 65 L. Ed. 877) (fixing standards for reasonable rents of real property); *Nebbia* v. *New York* (*supra*) (fixing the price of milk).

It must be pointed out that in all these and similar cases the prices were fixed by the State itself or by some governmental agency exercising the legislative power of the State. The statute here under consideration, in so far as it compels a non-contracting retailer to sell at fixed price schedules, imposes upon him prices fixed, not by a State body, but by private individuals. This phase of the case is discussed later in this opinion.

Although no authority can be found where either the New York or Federal courts have upheld the constitutionality of a statute regulating the price of ordinary commodities generally sold by ordinary businesses, there are a multitude of cases in our own courts and in the Federal courts invalidating State statutes purporting to regulate the prices of such commodities. (*Tyson & Bro.— United Theatre Ticket Offices* v. *Banton*, 273 U. S. 418; 47 S. Ct. 426; 71 L. Ed. 718; 58 A. L. R. 1236, price of theatre tickets; *Ribnik* v. *McBride*, 277 U. S. 350; 48 S. Ct. 545; 72 L. Ed. 913; 56 A. L. R. 1327, fees of employment agencies; *Wolff Packing Co.* v. *Court of Industrial Relations of State of Kansas*, 262 U. S. 522; 43 S. Ct. 630; 67 L. Ed. 1103; 27 A. L. R. 1280, wages; *Fairmont Creamery Co.* v. *State of Minnesota*, 274 U. S. 1; 47 S. Ct. 506; 71 L. Ed. 893; 52 A. L. R. 163, price of cream; *Williams* v. *Standard Oil Co. of Louisiana*, 278 U. S. 235; 49 S. Ct. 115; 73 L. Ed. 287; 60 A. L. R. 596, price of gasoline; *People* v. *Gillson*, 109 N. Y. 389; 17 N. E. 343; 4 Am. St. Rep. 465, price of food.) (See, also, *New State Ice Co.* v. *Liebmann*, 285 U. S. 262; 52 S. Ct. 371; 76 L. Ed. 747, statute requiring licenses of ice dealers.)

In all of these cases the necessity of protecting the public welfare was urged in support of the constitutionality of the legislation. With practical uniformity the contention has been rejected where the statutes had the effect of fixing the selling price of ordinary commodities and services, at least where no emergency existed determining the effective duration of the statute.

As stated in *Tyson & Bro.— United Theatre Ticket Offices* v. *Banton* (273 U. S. 418, 438; 47 S. Ct. 426, 431; 71 L. Ed. 718; 58 A. L. R. 1236, declaring invalid a statute fixing prices of theatre tickets), after reviewing the authorities: " Each of the decisions of this court upholding governmental price regulation, aside from cases involving legislation to tide over temporary emergencies, has turned upon the existence of conditions, peculiar to the business under consideration, which bore such a substantial and definite

relation to the public interest as to justify an indulgence of the legal fiction of a grant by the owner to the public of an interest in the use."

The statute in question is not confined to any emergency period. It is not made dependent upon any emergency. It is not in terms applicable to some temporary menace which has arisen to threaten the welfare of the State, but is apparently written into the law of the State for all time.

The statute is completely unrestricted in scope. It applies to every known commodity so long as it bears the name or trade-mark of the producer. The restriction that the commodity must be " in fair and open competition with commodities of the same general class produced by others " is so broad that it is difficult to conceive of any commodity which falls without that class. There is no attempt to distinguish between commodities which have some relation to the public welfare and commodities about which it is clear that the public can have no real interest. Certainly the commodities involved in this litigation, namely, cosmetics, perfumes, face powders, etc., cannot be claimed to be tied up with the general public welfare in the remotest degree. Nor can it be claimed that the State's welfare can in any way depend upon such industry, or many other industries which come within the clear intendment of this statute.

Even if the statute were enacted for a valid and constitutional purpose, as applied to this defendant, it cannot be upheld if, in its operation, it is arbitrary or discriminatory or if the means adopted to accomplish the purpose are not appropriate and relevant to that end. This principle was recognized in *Nebbia* v. *New York (supra)*: " If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied. * * * Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt." Further statement of this same principle may be found in numerous other cases in the United States Supreme Court. (*Nectow* v. *City of Cambridge*, 277 U. S. 183; 48 S. Ct. 447; 72 L. Ed. 842; *Adams* v. *Tanner*, 244 U. S. 590; 37 S. Ct. 662; 61 L. Ed. 1336; L. R. A. 1917F, 1163; Ann. Cas. 1917D, 973; *Burns Baking Co.* v. *Bryan*, 264 U. S. 504; 44 S. Ct. 412; 68 L. Ed. 813; 32 A. L. R. 661; *Weaver* v. *Palmer Bros. Co.*, 270 U. S. 402; 46 S. Ct. 320; 70 L. Ed. 654.)

An analysis of this statute discloses several startling features so arbitrary and discriminatory in effect that the statute cannot be sustained under this principle, in so far as it applies to retailers who have not signed price maintenance agreements.

*First.* No official State body is set up to fix prices. It is left to private individuals, producers, to determine, *first,* whether prices should be fixed, and, *second,* at what level. No outsider, who may be ultimately bound by the determination, is permitted an opportunity to be heard on either question. The retailer, who is going to be restricted in the conduct of his own business by the conclusion reached, is not allowed to present his views as to the reasonableness of the price, or, indeed, as to the necessity for fixing any price. The consumer, who must bear the burden of the increased price, has no opportunity to be heard before the prices are fixed. No machinery is provided for judicial or administrative review of any of the acts of producers and retailers in fixing prices.

*Second.* Before prices are fixed for any commodity, there is no finding by any legislative or administrative body that price fixing is necessary. That question is left to individual whim of each producer.

*Third.* There is no standard set up for the contract to be entered into between producer and retailer, by virtue of which contract the conduct of all retailers is to be governed. The contract may be oral or in writing. There is no requirement that the contracts be uniform. There is no requirement that the prices be uniform among retailers. Various special privileges may be given in connection with the contracts to some retailers, and not to others. As an example of what is possible, it might be pointed out that, in the affidavits submitted in conjunction with this application for a temporary injunction, the defendant contends that the plaintiff grants special privileges in the form of demonstrators, co-operative advertising, exchange privileges, to some retailers, and not to others. It is obvious that, if these privileges are denied to some retailers, such retailers, in effect, are compelled to pay a larger price than the retailers to whom these privileges are granted, even though the actual price of the commodity be the same.

*Fourth.* There is no standard set up which is adjustable to particular conditions in given localities. So far as the statute is concerned, if the operator of a large department store in New York city knows of a contract made by the plaintiff with a small merchant in a rural community in the far western part of the State, the New York department store merchant must comply with the price fixed by the producer in its contract with the rural merchant.

*Fifth.* No standard is set up to guide non-contracting retailers as to which contract they are to be bound by. So far as the statute prescribes, the producer may have many different forms of contract. He may make changes in these contracts. In fact, the contract annexed to the complaint herein permits the producer

"from time to time in its sole discretion to revise such minimum resale prices and provides that such revised resale prices shall become effective at such time as specified by Coty, which shall be at least three days after Coty shall have mailed a notice of such revision to the retailer." The burden is placed upon each non-contracting retailer to select which of the various forms of contract he is to follow. Is he to be guided by the most favorable form offered to any retailer or by the least favorable form offered to any retailer? The statute merely says: "Any contract." And there is no assurance that, if he selects one, the producer may not complain that he should have selected another. Non-contracting retailers must, at their peril, follow all price changes, although there is no requirement that notice thereof be given to them.

*Sixth.* There is no standard set up as to the method of fixing prices. Once a producer determines in his own discretion, untrammeled by any official finding of necessity or by any public convenience to be served, that prices should be fixed, the amount of the price is in the uncontrolled will of the producer. He may be guided by mistake, ignorance or malice. The price fixed by him may be wholly unreasonable and unfair. It may provide an exorbitant profit to himself and a small profit to the retailer. It may be so unreasonable that few, if any, retailers would be willing to abide by it. Yet, according to the statute, if he succeeds in making a contract with one retailer, all other retailers in the State are bound thereto.

*Seventh.* The statute sets up no reasonable standard between practices which are honest and fair and those which are dishonest and unfair. There is no statement of any statutory policy making such distinction; nor is the statute directed exclusively toward unfair or predatory conduct. Even though a retailer charge a fair price for his commodity involving a fair profit to himself, he may still be enjoined or mulcted in damages merely because the price he charges is not as exorbitant as the producer desires it to be.

*Eighth.* The statute furnishes no standard for its enforcement. No State officer or agency is created for the purpose of enforcing it. No governmental body has the responsibility of compelling compliance. Indeed, there is no legislative determination as to when and where enforcement shall be attempted at all. The matter is left to the producer. It is difficult to see how any one else would come within the class set up in section 2 of the statute — "any person damaged thereby." It lies within his discretion to enforce, or not to enforce, his agreements against any retailer, contracting or non-contracting. He may decide to compel obedience by one retailer and shut his eyes to violations by competitors of such

retailer. It is obvious that there is thus deposited in the hands of a producer the power to drive one retailer from business in his commodities and leave unmolested another retailer who violates the same fixed prices. Non-compliance with the statute is not made a crime; the State can in no way become a party to the enforcement process. It is left wholly to the whims and caprice of each producer. And, even if the statute gives the power to other parties who may be " damaged thereby," the same arbitrary and discriminatory exercise of it is made possible.

Nor can it be said within the principle of *Nebbia* v. *New York* (*supra*), above quoted, that the provisions of the statute are wholly relevant to the policy of it and to the abuses which it was designed to abolish. If the statute was aimed at " loss leaders," its terms do not so indicate. It does not prevent merely the selling at a loss. A retailer may, indeed, be selling at a fair profit and yet violate the statute if he sells it for one cent below the price fixed by the producer.

If the purpose of the statute was to prevent " predatory price cutting," and if we assume that that phrase means price cutting with an intent to injure competitors, the statute is not restricted by its terms or by fair interpretation to the eradication of that evil. The law applies to all retailers, irrespective of their motive or intent in selling their own property at lower prices. Without regard to the effect upon competitors, the retailer by this statute is compelled to charge his customers a higher price than might afford him a reasonable profit, even though his class of customers might not be willing to pay such price.

The importance of the motive in price cutting and price discrimination is illustrated by the two cases of *Fairmont Creamery Co.* v. *State of Minnesota* (274 U. S. 1; 47 S. Ct. 506; 71 L. Ed. 893; 52 A. L. R. 163) and *Central Lumber Co.* v. *State of South Dakota* (226 U. S. 157; 33 S. Ct. 66; 57 L. Ed. 164). In the latter case the Supreme Court of the United States declared constitutional a South Dakota statute which prohibited price discrimination " for the purpose of destroying the competition, of any regular, established dealer in such commodity, or to prevent the competition of any person who, in good faith intends and attempts to become such dealer." (So. Dak. Laws of 1907, chap. 131, § 1.) In the former case, however, the Supreme Court of the United States declared unconstitutional a Minnesota statute (Minn. Laws of 1921, chap. 305, § 1, as amd. by Minn. Laws of 1923, chap. 120; Minn. Gen. St. of 1923, § 3907) which prohibited price discriminations without regard to the motives behind them.

The absence of fair standards in this statute and the controlling effect of the whim of a producer over the business of others render the statute unconstitutional as arbitrary, discriminatory and unreasonable.

The holding of the court in *Washington ex rel. Seattle Title Trust Co.* v. *Roberge* (278 U. S. 116, 121; 49 S. Ct. 50, 52; 73 L. Ed. 210; 86 A. L. R. 654) illustrates the general constitutional provision involved. There a zoning ordinance was passed providing, among other things, that a philanthropic home might be erected in a certain residence district only with the written consent of the owners of two-thirds of the property within 400 feet of the proposed home. There was no finding by the Legislature that such building and use were inconsistent with public health, safety, morals or general welfare. The court held the ordinance unenforcible, although zoning legislation as a whole was unobjectionable, because the statute, without providing any legislative standard or rule, gave to " the owners of less than one-half the land within 400 feet of the proposed building authority — uncontrolled by any standard or rule prescribed by legislative action — to prevent the trustee from using its land for the proposed home." The court stated: " The superintendent is bound by the decision or inaction of such owners. There is no provision for review under the ordinance; their failure to give consent is final. They are not bound by any official duty, but are free to withhold consent for selfish reasons or arbitrarily and may subject the trustee to their will or caprice. * * * The delegation of power so attempted is repugnant to the due process clause of the Fourteenth Amendment."

The same reasoning led to a similar conclusion in *Yick Wo* v. *Hopkins* (118 U. S. 356; 6 S. Ct. 1064; 30 L. Ed. 220), which involved an ordinance of the city of San Francisco vesting in a governmental body arbitrary power to issue or refuse business licenses without setting up any standard for action in the statute.

The law here involved also contravenes article 3, section 1, of the Constitution of the State of New York, in that it delegates legislative power to others.

This question was the occasion of recent decision by our Court of Appeals in *Darweger* v. *Staats* (267 N. Y. 290, 304). There the Legislature passed what was known as the State National Recovery Act (Laws of 1933, Ex. Sess., chap. 781). The statute, enacted as an emergency measure, provided that, upon the filing in the office of the Secretary of State of New York a copy of any code approved by the President, such code should become effective for intrastate transactions in New York. As a result of the statute, a code authority within New York attempted to fix prices of coal in accordance with authority given in the code filed in Washington.

The court concluded that by this statute " the Legislature of the State of New York has turned over to the National Administrator the question of determining whether there shall be price-fixing in New York State of coal and what it shall be." The court on this ground declared the statute unconstitutional, stating that the Legislature cannot leave to a National Administrator the declaration of the necessity for fixing prices in our State. Like views as to the unconstitutional delegation of legislative power under provisions of the Federal Constitution similar to the provision of our State Constitution may be found in *Panama Refining Co.* v. *Ryan* (293 U. S. 388; 55 S. Ct. 241; 79 L. Ed. 446) and *Schechter Poultry Corp.* v. *United States* (295 U. S. 495; 55 S. Ct. 837; 79 L. Ed. 1570; 97 A. L. R. 947).

The Fair Trade Act is a broader delegation of power than was declared unconstitutional in *Darweger* v. *Staats* (*supra*). The delegation here is to private individuals, indeed, rather than to governmental authorities. The delegation has been without any standards or restrictions. As was stated by the court, " The Legislature has left too many things to be determined by other bodies to make this law constitutional."

The plaintiff relies chiefly upon the *Nebbia* case (*People* v. *Nebbia*, 262 N. Y. 259; *Nebbia* v. *New York*, 291 U. S. 502; 54 S. Ct. 505; 78 L. Ed. 940; 89 A. L. R. 1469). It is true that there is language in the *Nebbia* case which, ripped from the context of the opinion and divorced from the facts involved, might give some substance to the plaintiff's contention. The facts in that case, however, bear no resemblance to the present one.

In that case: (1) There were legislative findings of fact based upon a complete and thorough legislative investigation. (2) The enactment was effective only during the prescribed period of a short emergency, which was declared by the Legislature to exist. (3) The fixing of prices was related to one commodity only — milk. (4) The price of milk was to be fixed by a governmental agency after hearings, and was to be subject to judicial review by certiorari. (5) The legislative findings of fact upon which the statute was based were as follows: (a) That milk was an essential item of diet of all the People of the State; (b) that the absence of proper safeguards of such product would lead to the spread of disease; (c) that proper and adequate safeguards were being threatened in the State of New York because of existing insufficient return to milk producers; (d) that the milk industry was a paramount industry of the State and that the maintenance of it was vital to the credit and economic structure of the State; (e) that the

financial structure of the industry was in danger because of certain conditions and various enumerated factors of instability peculiar to the industry itself. (6) The statute was admittedly passed as a health measure under the recognized limitations of the police power. (7) Prosecution and enforcement were lodged with the State authorities.

Each of the above itemized facts present in the *Nebbia* case indicates a radical difference from the case at bar. A mere statement of the differences should suffice to indicate that the holding of the court in the one is in no way controlling upon the legal conclusions in the other.

It is true that in the *Nebbia* case the Supreme Court of the United States did not require in terms that the commodity be " affected with a public interest." That ancient expression was defined anew in the opinion of the court (291 U. S. 502, at p. 536; 54 S. Ct. 505, 516; 78 L. Ed. 940; 89 A. L. R. 1469) as a phrase which " can, in the nature of things, mean no more than that an industry, for adequate reason, is subject to control for the public good." There is implicit in any definition of the phrase, however, the requirement that there be such relationship between the business and the public welfare that governmental interference with the private property and rights involved will be justified in spite of the due .process clauses.

It cannot be contended that the *Nebbia* case is authority for the proposition that the prices of ordinary commodities may, without more ado, be fixed by the Legislature, much less by private individuals. Our Court of Appeals pointed out in *Darweger* v. *Staats* (*supra*) that the *Nebbia* case was not such authority, even if an emergency were declared to exist, and even if the price-fixing power were limited to the period of the emergency. The court stated: " The briefs place much emphasis upon *Nebbia* v. *New York* (291 U. S. 502); *People* v. *Nebbia* (262 N. Y. 259), and claim that this is an authority to sustain legislation fixing the price of any commodity — shoes, clothes, coal, hardware or anything else that may strike the Legislature's fancy, provided an emergency be declared. The fixing of the price of milk in the *Nebbia* case was a mere incident to other regulations which tried to meet an abuse growing up to the detriment of the farmer and his stock. This control of the output protected the very vitals of the industry, and it would not have been a far step to have held, as perhaps it was intimated, that the milk industry was one touched with a public interest, such as water, electricity, grain and the like. To say that the *Nebbia* case is an authority for the Legislature to fix the prices of all commodities is not justified by the decision. What the legislative power may be

in a given case regarding any industry we do not undertake to say. Sufficient unto the day is the power thereof."

Although somewhat different phraseology was used by the courts in sustaining legislation fixing the price of milk, still " it would not have been a far step to have held, as perhaps it was intimated, that the milk industry was one touched with a public interest, such as water, electricity, grain and the like." (*Darweger* v. *Staats, supra.*)

The plaintiff also urges that the complaint states a cause of action wholly apart from the provisions of section 2 of the Fair Trade Act. It bases such contention on the theory that the acts of the defendant are in fact inducing breaches of the contract between the plaintiff and its various contracting retailers, within the doctrine of the decision in *Lumley* v. *Gye* (2 El. & Bl. 216) and similar cases. The defendant here, however, is not alleged to be making any effort to induce such breaches of contract. The defendant is merely selling products at prices lower than those agreed upon by the plaintiff and other retailers. The fact that incidental thereto some of the contracting retailers may break their agreements in order to meet competition cannot be laid at the door of this defendant in an attempt legally to charge it with the results of such breach.

Nor can the plaintiff sustain its complaint, as it seeks to do, by analogy to such cases as *Glanzer* v. *Shepard* (233 N. Y. 236); *International Products Co.* v. *Erie R. Co.* (244 id. 331); *Doyle* v. *Chatham & Phenix National Bank* (253 id. 369), and *Ultramares Corporation* v. *Touche* (255 id. 170). Those cases deal merely with the results of negligently spoken words, upon which third parties not privy to any contract have relied. It is true that these cases illustrate what Chief Judge CARDOZO referred to in *Ultramares Corporation* v. *Touche* (*supra*) as modern assault upon the citadel of privity in creating new rights in favor of persons who are not parties to a contract and new responsibilities upon such persons. Nevertheless, they are in no way analogous to the facts in this case so as to be persuasive authority.

Cases cited by the plaintiff such as *Locker* v. *American Tobacco Co.* (121 App. Div. 443; affd., 195 N. Y. 565); *Walsh* v. *Dwight* (40 App. Div. 513); *Park & Sons Co.* v. *National Wholesale Druggists' Assn.* (54 id. 223; affd., 175 N. Y. 1), and *Marsich* v. *Eastman Kodak Co.* (244 App. Div. 295), which have to do with legality of contracts fixing resale prices, are not relevant to this discussion. The question herein involved is not the legality of contracts actually entered into; but whether they can constitutionally be made applicable to persons who not only are not parties to the contract but who have refused definitely to become parties thereto.

The presence of a trade-mark on plaintiff's products does not of itself confer upon it the right to regulate resale prices. (*Dr. Miles Medical Co.* v. *Park & Sons Co.*, 220 U. S. 373; 31 S. Ct. 376; 55 L. Ed. 502; *Boston Store of Chicago* v. *American Graphophone Co.*, 246 U. S. 8; 38 S. Ct. 257; 62 L. Ed. 551; Ann. Cas. 1918C, 447; *Federal Trade Commission* v. *Beech-Nut Packing Co.*, 257 U. S. 441; 42 S. Ct. 150; 66 L. Ed. 307; 19 A. L. R. 882.)

It is true that every presumption of constitutionality must be indulged in. The presumption here is overcome so conclusively, however, that even a court of first instance should not hesitate to declare section 2 of the statute invalid, at least in so far as it applies to persons not parties to resale price agreements.

Whether it would be valid in connection with sales of the very goods which at some time previous had been the subject of a fair trade contract need not be here considered, in the absence of allegation that such goods are involved.

The contention of the defendant that section 2 of the statute must be construed as applicable only to the very *res* which was the subject of a prior price maintenance agreement cannot be sustained. Its language is of the broadest scope, and applies to all persons and all commodities. The purpose of the statute is to cover all trade-marked commodities of standard quality and to permit the producer to regulate the price of all sales. The title of the act (Laws of 1935, chap. 976) reads: "An act to protect trade mark owners, distributors and the public against injurious and uneconomic practices in the distribution of articles of standard quality under a distinguished trade mark, brand or name." No legislative intention is apparent to restrict the application of the law as urged by the defendant.

Paragraph (b) of subdivision 1 of section 1 seeks in part to accomplish what the defendant argues is the purpose of section 2. Though confusedly expressed, that paragraph would seem to bespeak the legislative intention that agreements be legalized which carry the price fixation beyond the first transaction and which contractually compel the first vendee to require similar contractual obligations from the second and subsequent vendees. Section 2, however, goes considerably further in applying the obligation to all vendors, not contractually, but by operation of law.

Motion for injunction *pendente lite* is denied, and complaint dismissed. Orders signed.