ATLANTIC CITY CASINO ASSOCIATION, AND GREAT BAY HO-TEL & CASINO INC. T/A SANDS HOTEL & CASINO, PLAIN-TIFFS, v. IRWIN I. KIMMELMAN, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, CITY OF ATLANTIC CITY, THE ATLANTIC COUNTY BOARD OF TAXATION, WILLIAM G. FERRY, TAX ASSESSOR OF ATLANTIC CITY, AND ALBERTA WATKINS, TAX COLLECTOR OF ATLANTIC CITY, DEFEND-ANTS.

Superior Court of New Jersey
Law Division Atlantic County

Decided October 23, 1984.

 

654

*Edward G. Rosenblum* for plaintiffs (*Rosenblum & Rosenblum*, attorneys).

*Saul A. Wolfe* for defendants City of Atlantic City, William G. Ferry, Tax Assessor of Atlantic City and Alberta Watkins, Tax Collector of Atlantic City (*Skoloff & Wolfe*, attorneys).

*Harry Haushalter* for defendants *Irwin I. Kimmelman*, Attorney General of the State of New Jersey, and Atlantic County Board of Taxation (*Irwin I. Kimmelman*, Attorney General of New Jersey, attorney).

RIMM, J.T.C., (temporarily assigned).

The issue before the court in this matter is the constitutionality of Chapter 67 of the Laws of 1984, hereinafter referred to as *c.*67, which is entitled "An Act concerning the revaluation of real property in certain municipalities."[1] Central to the issue is the authority of the Legislature to set aside a judgment of this court. There is no reported case in this State holding whether or not the Legislature has such authority. The importance of the issue and the fact that an appeal has been taken from my oral determination of the matter on October 23, 1984,[2] requires that I reduce the determination to writing in accordance with *R.* 2:5–1(b).[3]

---

[1]The issue of the standing of plaintiff, Atlantic City Casino Association, to assert the constitutional challenge was raised in the briefs and at oral argument. This issue is moot because plaintiff, Great Bay Hotel and Casino, Inc., t/a Sands Hotel & Casino, is a property owner and taxpayer of Atlantic City and therefore has standing to maintain this action.

[2]Defendants argued on the return date of the order to show cause that plaintiffs' complaint should be dismissed as untimely because it was filed beyond the 45 day time limit applicable to prerogative writ actions. *R.* 4:69–6. Although the parties were in dispute as to the "accrual date" of plaintiffs' cause of action, *R.* 4:69–6(c) permits the enlargement of the 45 day period where it is "manifest that the interest of justice so requires." Where "important and novel constitutional questions" are involved, it is appropriate for the court to suspend the operation of the rule. *Schack v. Trimble*, 28 *N.J.* 40, 47–48 (1958). *See also, Brunetti v. New Milford Bor.*, 68 *N.J.* 576, 586 (1975).

On November 15, 1978, nearly six years before the hearing in the present matter, the Atlantic County Board of Taxation ordered the City of Atlantic City to engage an outside appraisal firm to revalue the real property in the city for local property tax assessment purposes. The city failed to comply with the order, and in early 1980, about a year and a half later, the county board of taxation sought an order from this court in the matter of *Wilczynski v. Ferry,* Docket No. L 63650–78, directing the city to comply with the county board's order of November 15, 1978.[4] An order was entered by this court directing the City of Atlantic City to hire an outside revaluation firm in accordance with the county board order and with such requirements to be imposed on the city by the Director of the Division of Taxation in accordance with applicable statutes. The order required the revaluation to be effective for the tax year 1982 as of October 1, 1981. Following the entry of that order the city moved before the court for a modification of the order request-

Defendants also moved to vacate the order to show cause on the ground that an action in lieu of prerogative writ may not be brought in a summary action pursuant to *R.* 4:67–1(a), 2. The motion was denied. Certain rules may be relaxed or dispensed with "if adherence to [them] would result in an injustice." *R.* 1:1–2. Since the element of time was critical, because a delay in proceeding to determine the important constitutional issues here involved would potentially render them moot and prejudice plaintiffs' rights to relief, relaxing the rule was justified.

3Defendants, City of Atlantic City, William G. Ferry, Tax Assessor of Atlantic City, and Alberta Watkins, Tax Collector of Atlantic City, filed a notice of appeal in the Superior Court, Appellate Division, challenging that portion of the judgment which held that *c.*67 was unconstitutional. By letter dated December 20, 1984 to the Clerk of the Superior Court, Appellate Division, the Attorney General notified the clerk that defendants, Irwin I. Kimmelman, Attorney General, and the Atlantic County Board of Taxation, did not intend to participate in the appeal.

4For a partial history of the unusual assessing practices in Atlantic City, see *Atlantic City v. Atlantic County Bd. of Tax.,* 2 *N.J.* Tax 30 (Tax Ct.1980), aff'd o.b., 4 *N.J.Tax* 685 (App.Div.1982), certif. den., 93 *N.J.* 250 (1983).

ing that the revaluation be delayed and implemented for the tax year 1983, as of October 1, 1982, so that the city and the revaluation company would have an additional year within which time the city could assure itself that the revaluation would be properly implemented. A second order was entered on May 29, 1980 directing the city to implement a revaluation for the tax year 1983. The revaluation was completed. However, early in 1983, the Legislature adopted Chapter 202 of the Laws of 1983 providing for a delay in the implementation of the revaluation for one year from 1983 until 1984. The statutory enactment was not challenged. Accordingly, the city proceeded to implement the revaluation for the tax year 1984, as of October 1, 1983. The assessor completed his work, the assessment records of the city were submitted to the county board in accordance with the statutory obligation imposed on the assessor, and the county board, in accordance with the statutory obligation imposed on it, approved the revaluation figures for the tax year 1984. The city's tax assessment rolls were then returned by the county board to the tax collector who disobeyed the court order by failing to send out tax bills for 1984 in anticipation of another legislative moratorium further interfering with the court's order. Thereafter on July 2, 1984, the Legislature enacted c.67, which provides as follows:

BE IT ENACTED by the Senate and General Assembly of the State of New Jersey:

1. Notwithstanding the provisions to the contrary of any law, rule, regulation or judicial order, no city of the fourth class having a population in excess of 40,000, according to the latest federal decennial census, shall be required to implement a revaluation of real property for the 1984 tax year. The determination of a city not to implement a revaluation pursuant to this act shall not prevent the city from conducting and implementing any partial or complete reassessment of real property in the city during the time covered by this act.

2. At the request of a municipality that, pursuant to section 1 of this act, does not implement a revaluation of real property for the 1984 tax year, the State Treasurer shall have the authority to extend the temporary moratorium of the implementation of the revaluation for the 1985 tax year, upon the Treasurer's determination that an extension of the moratorium is in the best interest of the municipality. The municipality shall make its request for the extension to the State Treasurer on or before January 1, 1985. The Treasurer shall inform the municipality of his decision on or before January 31, 1985.

3. This act shall take effect immediately.

The statement attached to the statute reads as follows:

Senate Bill No. 1052 would make permissive the implementation of a revaluation of real property during the 1984 and 1985 tax years in any city of the fourth class with a population in excess of 40,000.

By the provisions of section 1 of the statute, the Legislature has set aside the judgment of this court directing the city to revalue itself and has given to the city the authority to decide whether or not there will be a revaluation implemented for the tax year 1984 and has reversed the court-ordered implementation of a revaluation *already in effect* at the time of the statutory enactment.

Plaintiffs argue that the statute is an unconstitutional interference by the Legislature with the court; that the statute is special legislation; that section 2 delegates authority to the executive branch of government without any standard on the basis of which the delegated authority is to be exercised; and, finally, that the statute is an unconstitutional legislative enactment in contravention of the provision of the Constitution of the State of New Jersey requiring uniform assessing.

Initially, it must be recognized that certain well-settled rules of statutory construction are critical to the analysis which attends a determination of the constitutionality of a legislative enactment.

There is a strong presumption that a statute is constitutional, *General Electric Co. v. City of Passaic*, 28 *N.J.* 499, 510 (1958); *In re Village of Loch Arbor* [Arbour], 25 *N.J.* 258, 264–265 (1957), and a legislative act will not be declared void unless its repugnancy to the Constitution is clear beyond a reasonable doubt. *Gangemi v. Berry*, 25 *N.J.* 1, 10 (1957). [*Harvey v. Essex County Bd. of Freeholders*, 30 *N.J.* 381, 388 (1959).]

Furthermore, the burden of overcoming the presumptive validity of an act of the Legislature is placed upon the party making the challenge, *Jamouneau v. Harner*, 16 *N.J.* 500, 515 (1954), that is, the plaintiffs herein. Indeed:

"[O]ne of the most delicate tasks a court has to perform is to adjudicate the constitutionality of a statute. In our tripartite form of government, that high prerogative has always been exercised with extreme self-restraint, and with a deep awareness that the challenged enactment represents the considered action

of a body composed of popularly elected representatives. As a result, judicial decisions from the time of Chief Justice Marshall reveal an unswerving acceptance of the principle that every possible presumption favors the validity of an act of the Legislature. As we noted in *Rowe v. Kervick*, 42 *N.J.* 191, 229 (1964), all the relevant New Jersey cases display faithful judicial deference to the will of the lawmakers whenever reasonable men might differ as to whether the means devised by the Legislature to serve a public purpose conforms to the Constitution. And these cases project into the forefront of any judicial study of an attack upon a duly-enacted statute, both the strong presumption of validity and our solemn duty to resolve reasonably conflicting doubts in favor of conformity to our organic charter. Moreover, the conclusions reached in such cases demonstrate that in effectuating this salutary policy, Judges will read the questioned statute as implying matters requisite to its constitutional viability if it contains terms which do not exclude such requirements." [*New Jersey Sports and Exposition Authority v. McCrane*, 61 *N.J.* 1, 8 (1972).]

## I

■ Even given these rules of construction, the subject statute is unconstitutional on the ground that it is an improper interference by the Legislature with the court. Our State Constitutional provides as follows:

The powers of the government shall be divided among three distinct branches, the legislative, executive and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution. [*N.J. Const.* (1947) Art III, § 1, para. 1.]

This constitutional provision for the separation of the powers of our three independent and distinct branches of government is intended to guarantee a system of checks and balances that will prevent the power of any one branch from becoming inordinate. *State v. Leonardis*, 73 *N.J.* 360, 370 (1977). This system is intolerant of any impairment of "the essential integrity of [any] one of the great branches of government." *Massett Building Co. v. Bennett*, 4 *N.J.* 53, 57 (1950). The rule is settled that it is the duty of the legislative, executive and judicial branches of government to abstain from and to oppose encroachments upon each other. *Allan v. Durand*, 137 *N.J.L.* 30, 33 (Sup.Ct.1948).

In enacting *c.67*, the Legislature has exercised power "properly belonging to" the court. Essentially, the Legislature has granted Atlantic City authority to delay the implementation of

its court-ordered revaluation of real property for local property assessment purposes for the tax year 1984, thereby excusing the city from compliance with the terms of a final judgment of this court.[5] This is clearly an unlawful encroachment upon the function of the judiciary, *i.e.*, to completely determine all matters in controversy between the parties before the court in accordance with our State Constitution:

> 4. Subject to rule of the Supreme Court, the Law Division and the Chancery Division shall each exercise the powers and functions of the other division when the ends of justice so require, and legal and equitable relief shall be granted in any cause so that all matters in controversy between the parties may be completely determined. [*N.J. Const.* (1947) Art VI, § 3, para. 4.]

The city elected to delay the revaluation and has, as a result of the legislative interference, thus disobeyed the court order.

■ The former Supreme Court enunciated the rule concerning the impropriety, under the Constitution, of legislative interference with the final judgment of a court of competent jurisdiction in *State, ex rel. Doyle v. Newark City*, 34 *N.J.L.* 236 (Sup.Ct.1870).[6] It said:

> The judgment of a court of competent jurisdiction cannot be reversed, avoided, or set aside by the legislative power. [34 *N.J.L.* at 240.]

The court held that the legislative act at issue did not have the effect of rendering valid an assessment for improvements benefiting plaintiff's property which the court had set aside as illegal. Instead, the act did no more than to order that a new and independent assessment be made by the City of Newark upon plaintiff's property. Thus, as the enactment left the court's judgment respecting the original, invalid assessment untouched, there was no unconstitutional interference with the

---

[5]The order entered in *Wilczynski v. Ferry, supra,* was never appealed and the time for filing an appeal has expired. *R.*2:4–1(a). The entry of the order constituted a complete adjudication of all issues in that matter, and the Attorney General conceded at the hearing that the judgment in that matter was a final judgment from which no appeal had been taken.

[6]The Supreme Court, at the time of the decision, was not the court of last resort in New Jersey.

judiciary. *Id.* The court's statement of the rule concerning legislative interference was therefore "judicial dictum." It constituted "an expression of opinion on a question directly involved, argued by counsel and deliberately passed on by the court," but it was "not necessary to [the] decision" in the case. *Crescent Ring Co. v. Travelers Indemnity Co.,* 102 *N.J.L.* 85, 89 (E. & A. 1925). Despite its character as dictum, the court stated that "[t]he legal proposition is undoubtedly correct," 34 *N.J.L.* at 240, and represents the rule concerning this aspect of the principle of the separation of powers, particularly since the question had been raised by plaintiff and was addressed and decided by the court. In fact, the court's statement on this issue has not been overruled, and it represents the only statement of the principle that has been found in the case law of New Jersey. In *State v. Lanza,* 74 *N.J.Super.* 362, 377 (App. Div.1962), the court cited the above-quoted principle without comment, but found that the facts presented in that matter were not analogous to those of the *Doyle* case, and therefore determined that the rule did not support the arguments raised by defendant. In any event, the court recited the dictum in *Doyle* in an approving manner. *See also Commissioners of Sinking Fund v. Linden,* 40 *N.J.Eq.* 27 (Ch.Div.1885). It is accordingly deserving of due consideration, and, since "there are no adjudications to the contrary" it should "constitute a reliable witness to what is our law." *Hughes v. Eisner,* 14 *N.J.Super.* 58, 64 (App.Div.1951), app. dism., 8 *N.J.* 228 (1951). *Accord Crescent Ring Co.,* 102 *N.J.L.* at 89 (Judicial Dictum "should not be lightly disregarded."); *cf. Jamouneau v. Division of Tax Appeals,* 2 *N.J.* 325, 332 (1949) (Judicial dictum "is entitled to due consideration, but does not invoke the principle of *stare decisis.*")

Although our highest court has not ruled on the constitutional question of legislative interference with the judicial power, there is ample authority to support my determination that the enactment of *c.*67 was an unconstitutional usurpation of the judicial function to finally determine controversies of law and

fact between litigants before the court. The proposition in *Doyle* represents the applicable rule of law in several other jurisdictions.

In *Pennsylvania Co., etc. v. Scott*, 346 *Pa.* 13, 29 *A.*2d 328 (1942), the Pennsylvania Supreme Court had to consider whether the retroactive application of the Deficiency Judgment Act of 1941 [7] to a judicial sale consummated prior to its effective date was unconstitutional as (1) an impairment of any property right in the judgment [8] under which the sale was had or (2) an interference with judicial functions. The court held that the application of the statute to that sale dealt only with the issue of valuation and not with "the inherent attributes of the judgment itself," and accordingly upheld the application against attack under the State and Federal constitutions. *Id.* at 18, 29 *A.*2d at 330. However, the court cited at length the constitutional prohibition against legislative encroachment on the judiciary, including the purpose for so limiting the legislative power.

> It is elementary that the legislature may not, under the guise of an act affecting remedies, destroy or impair final judgments obtained before the passage of the act, and this principle prohibits not only a statutory reopening of cases previously decided by the court but also legislation affecting the inherent attributes of judgments or annulling or substantially interfering with the right to issue execution and to collect the amount due thereon. [citations omitted] There are two reasons for this limitation of legislative power; one, that a judgment is property of which, under state and federal constitutional prohibi-

---

[7]P.L. 400, 12 P.S. § 2621.1 *et seq.*

[8]The courts of New York have established the principle that the rights flowing from the final judgment of a court are rights of property. These rights become vested by the action of the court. As such, they are placed beyond the power of the Legislature. Legislative interference with a court's judgment constitutes an unlawful deprivation of property without due process of law. *See, e.g., Livingston v. Livingston*, 173 *N.Y.* 377, 383, 66 *N.E.* 123, 125 (1903) ("So fixed and so inviolate are the rights secured by a judgment that any legislation which attempts to deprive a party of their absolute enjoyment must be condemned."); *Gilman v. Tucker*, 128 *N.Y.* 190, 204, 28 *N.E.* 1040, 1044 (1891) ("[T]he repugnancy between the law and the constitutional rights of the citizen is so irreconcilable that the law must fail.").

tions, the judgment creditor cannot be deprived without due process of law [footnote omitted]; the other, *that under our system of the division of governmental powers the legislature cannot invade the province of the judiciary by interfering with judgments or decrees previously rendered.* [Footnote omitted; Emphasis supplied; 346 *Pa.* at 16–17, 29 *A.*2d. at 329–330.]

Similarly, in *Leahey v. Farrell*, 362 *Pa.* 52, 66 *A.*2d 577 (1949), it was said:

No less clear is it, under the constitutional distribution of governmental powers, that *the legislature cannot dictate to the courts how they shall decide matters coming before them judicially.*

The legislature cannot, by an act of assembly, overrule a judicial decision. [Emphasis by the court; *Id.* at 56, 66 *A.*2d at 579.]

The courts of California have also expressly adopted, as a constitutional limitation on the power of the Legislature, the prohibition against legislative interference with judgments entered in a judicial proceeding. The Supreme Court of California in *Mandel v. Myers*, 29 *Cal.*3d 531, 174 *Cal.Rptr.* 841, 629 *P.*2d 935 (1981), held that "insofar as the Legislature's exclusion of [an] attorney fee award . . . rested upon a legislative rejection of the merits of the final court judgment, . . . such exclusion is invalid." *Id.* at 550, 174 *Cal.Rptr.* at 852, 692 *P.*2d at 946. The court reasoned that:

it is clear that the fundamental separation of powers doctrine embodied in article III, section 3 of the California Constitution . . . forbids any such legislative usurpation of traditional judicial authority. Our Constitution assigns the resolution of such specific controversies to the judicial branch of government (Cal. Const., art. VI, § 1) and provides the Legislature with no authority to set itself above the judiciary by discarding the outcome or readjudicating the merits of particular judicial proceedings. As this court emphasized more than a century ago in the case of *Pryor v. Downey* (1875) 50 *Cal.* 388, 405: "[H]ad the Legislature gone one step further and, by special enactment . . . commanded the courts which had rendered a judgment in favor of a plaintiff . . . to set it aside and to enter a judgment for the defendant, such arbitrary attempt would, at once, have been recognized as an abuse not to be tolerated under our free constitution of government. . . ." Just as the court may not reevaluate the wisdom or merits of statutes which have secured final passage by the Legislature, the Legislature enjoys no constitutional prerogative to disregard the authority of final court judgments resolving specific controversies within the judiciary's domain. [*Mandel, supra,* 29 *Cal.*3d at 547, 174 *Cal.Rptr.* at 850–851, 692 *P.*2d at 944–945.]

In *People v. Orvis*, 374 *Ill.* 536, 30 *N.E.*2d 28 (1940), the Supreme Court of Illinois recognized that the constitutional

provision declaring the separation of governmental powers prohibited the General Assembly from exercising its power to promulgate a "curative act," which had the effect of making a void proceeding valid. The essential facts of the *Orvis* case were that the Illinois General Assembly had passed the so-called "validating act of 1935," [9] which had the effect of rendering valid a bond issue that the Supreme Court had previously declared to be invalid. In issuing the bonds, the Lake County School District had raised the indebtedness of the district in excess of the statutory limit. The court held that its judgment that the bond issue was invalid prevented the Legislature from exercising its power to validate the bonds and the claims evidenced thereby, and said:

"the legislative action cannot be made to retroact upon past controversies, and to reverse decisions which the courts, in the exercise of their undoubted authority, have made; for this would not only be the exercise of judicial power, but it would be the exercise in the most objectionable and offensive form, since the legislature would, in effect sit as a court of review to which the parties might appeal when dissatisfied with the rulings of the courts." [citing Cooley's Constitutional Limitations (7th ed.) p. 531] It is one of the fundamental principles of our government that the legislative power shall be separate from the judicial. If the General Assembly would prescribe a different rule for the future from that which the courts enforce, it must be done by statute applicable in the future, and cannot be done by setting aside final judgments of the courts. Such leaves the law unchanged and has the effect merely of seeking to require that the courts construe it not according to judicial judgment but according to later legislative will. [*Id.* at 542–543, 30 *N.E.*2d at 31.]

The present case, in which the legislative act operates to change the outcome of a finally adjudicated controversy, is to be distinguished from the case of a statute that is applicable only to pending actions in which no final judgment has been entered and to all future actions, suits or proceedings. The latter type of statute does not violate the constitutional principle of the separation of powers. Thus a statute which is to apply to pending and future judicial proceedings is a valid legislative enactment under the New Jersey Constitution. In *Beneficial Industrial Loan Corp. v. Smith*, 170 *F.*2d 44 (3d

---

[9]Laws 1935, p. 1335, Ill.Rev.Stats.1937, C. 122, § 406y (1935).

Cir.1948), the court ruled that *L.*1945, *c.*131, § 1 [10] did not "abridge the equity jurisdiction of the court of chancery in violation of Article VI, § 1 of the New Jersey Constitution." *Id.* at 56–57. The statute was made expressly applicable to all actions pending as of its effective date in which no final judgment had been entered, and to all future actions. *R.S.* 14:3–17, *N.J.S.A.* 14:3–17.[11] The court relied on several cases decided by the courts of New Jersey, among them *Igoe Bros. v. National Surety Co.,* 112 *N.J.L.* 243 (E. & A. 1933), in which it was held essentially that the Legislature is empowered to pass acts affecting the awarding of costs in pending and subsequent actions. The court noted that these decisions were "clear rulings to the effect that no provision of the New Jersey Constitution [had been] violated," and concluded that the courts of New Jersey would hold that the application of the statute *sub judice* to pending and future actions would violate no constitutional provision. *Beneficial Industrial Loan Corp., supra,* 170 *F.*2d at 57.

■ By contrast, *c.*67 of the Laws of 1984 operates to affect the result of a judicial proceeding in which a final judgment has been entered. Accordingly, it is an unconstitutional usurpation of the function of the judiciary.

II

Since I have determined that *c.*67 is an unconstitutional interference by the Legislature with the court, no further discussion of constitutional invalidity is necessary. However, plaintiffs also strenuously contend that *c.*67 is unlawful special legislation in contravention of *N.J. Const.* Art. IV, § 7, par.

---

[10]*R.S.* 14:3–15, *N.J.S.A.* 14:3–15 [now *N.J.S.A.* 14A:3–6(3) ] entitles a corporation in whose right a derivative action has been brought to require the complainant[s] to give security for the reasonable expenses of the action, including counsel fees, which may be incurred by the defendant.

[11]Repealed by *N.J.S.A.* 14A:16–3.

9(6), which provides that "The Legislature shall not pass any private, special or local laws: ... (6) Relating to taxation or exemption therefrom." The parties have all addressed the issue and it should be dealt with, although an extended discussion of the issue is not necessary because of the exhaustive opinions of Justice Garibaldi in *Newark Superior Officers Association v. Newark,* 98 *N.J.* 212 (1985) and *Mahwah Tp. v. Bergen County Board of Taxation,* 98 *N.J.* 268 (1985), both decided on January 15, 1985, after the judgment in the present case.

Although recent years have spawned a number of legislative moratoria on municipal revaluations for local property tax assessment purposes, there are no reported challenges to any of them. Without regard to the issue of legislative encroachment on the judiciary, *c.* 67, the moratorium legislation now before me, is unconstitutional as special legislation. The statute's effective application to only one city does not of itself require such a conclusion. *Paul Kimball Hosp. v. Brick Tp. Hosp.,* 86 *N.J.* 429 (1981). However, when that classification is coupled with the application of the act to a specific year, it is difficult to conceive of a rational basis for either (1) excluding other municipalities from the moratorium for 1984 or (2) limiting municipalities within the population classification to a moratorium for *only* the tax year 1984. *Newark Superior Officers Association v. Newark,* at 315–317. As to this second point, unlike the classification that was upheld in *Mahwah Tp. v. Bergen County Board of Taxation,* the very nature of this peculiar legislation makes it impossible for any other municipality "to come within its scope." At 827. There is no demonstrable reason for a moratorium delaying the implementation of the revaluation for the tax year 1984 in view of the fact that the original order of the Atlantic County Board of Taxation for a revaluation was entered in 1978. Conversely, if there is a reason for such a moratorium, then there is no demonstrable reason for the classification in the statute under attack. *Mahwah,* at 831–832.

## III

Even if the legislation were not otherwise unconstitutional, section 2 of the act is invalid as an unconstitutional delegation of authority to the executive branch of government. Section 2 provides that a municipality which has delayed the implementation of a revaluation for the 1984 tax year pursuant to section 1 may request the State Treasurer to extend the moratorium for the tax year 1985. Thus, the Legislature has delegated the authority to permit a further delay in the implementation of the revaluation to an officer of the executive branch of government.

"Although the early decisions generally spoke in prohibitory terms, it is now established that legislative delegations [to a coordinate branch of government] are permissible...." *State v. Hotel Bar Foods,* 18 *N.J.* 115, 124 (1955). However, it is incumbent upon the Legislature to provide "standards to guide the discretionary exercise of the delegated power." *Worthington v. Fauver,* 88 *N.J.* 183, 208 (1982). The Supreme Court set forth the limits on the Legislature's power to delegate its authority in *Pascucci v. Vagott,* 71 *N.J.* 40 (1976). "A legislative body '... is free to delegate legislative authority provided it has exercised "the essentials of the legislative function"—of determining the basic legislative policy and *formulating a rule of conduct....*' " [Emphasis supplied; *Id.* at 49, citing *Amalgamated Meat Cutters & Butcher Work v. Connally,* 337 *F.Supp.* 737, 746 (D.D.C.1971).]

Three basic reasons have been given for this requirement that sufficient basic standards accompany the delegation of power. They are: (1) "standards define the area in which the agency develops the experience and expertise that the Legislature has neither the time nor resources to develop;" (2) "standards facilitate judicial review of agency [executive] decisions, which guard against arbitrary and capricious governmental action" and (3) standards prevent "the Legislature from abdicating its political responsibility" and prevent "undemocratic,

bureaucratic institutions from wielding all-encompassing, uncontrollable government power." *Mt. Laurel Tp. v. Public Advocate of N.J.*, 83 *N.J.* 522, 532 (1980). The Supreme Court concluded that the discretion of the executive branch must be "hemmed in by standards sufficiently definitive to guide its exercise" if the delegation of authority is to be constitutional. *Id.*

By section 2 of *c.*67, the Legislature has given to the executive branch the authority to determine whether "it is in the best interest of the municipality" to grant an extension of the moratorium for one year. However, nowhere in the text of the statute, or in the accompanying legislative materials is there a statement of the standard that will serve to aid the Treasurer in making his decision. The Treasurer is instead empowered to grant or deny the extension depending on what he deems to be "in the best interest" of Atlantic City. I determine that, in this case, the enunciated "standard" is in fact no standard at all, and that *c.*67 is therefore an unconstitutional delegation of legislative authority. In its present form, section 2 of *c.*67 encourages an arbitrary discharge of the delegated authority and vests in the Treasurer the uncontrolled discretion to make policy decisions. Effective judicial review is essentially foreclosed, because there is no standard against which to measure the propriety of the decision.

The Legislature has wide latitude in fixing standards for the delegation of authority. The Supreme Court has said that "the exigencies of modern government have increasingly dictated the use of general, rather than minutely detailed standards, and they have, for the most part, received the approval of our courts." *State v. Hotel Bar Foods*, 18 *N.J.* at 124. Broad statutory guidelines and standards have been upheld. *See, e.g., Burton v. Sills*, 53 *N.J.* 86 (1968), app. dism., 394 *U.S.* 812, 89 *S.Ct.* 1486, 22 *L.Ed.*2d 748 (1969) (Superintendent of State Police to be guided in the exercise of his discretion in licensing firearms dealers by what is necessary for the

"public safety, health and welfare"); *Worthington v. Fauver*, 88 *N.J.* 183 (1982) (delegation of authority to executive branch to issue emergency orders "to protect the public health, safety, and welfare"); *Sprissler v. Pennsylvania-Reading S.S. Lines*, 45 *N.J.* 127 (1965) (Highway Commissioner designated by statute to determine what railroad service "is essential in the public interest"). In fact, in several cases the Supreme Court found that an adequate standard, although not expressly enumerated, could be reasonably inferred from the statutory scheme as a whole, thus preserving the constitutionality of the legislative delegation.

In ascertaining the presence of standards to:
support delegated powers, it is fundamental that [the court is] not confined to the four corners of the particular section under consideration, but [is] obliged to examine the entire act in the light of its surroundings and objectives. [*Schierstead v. Brigantine City*, 20 *N.J.* 164, 169, 119 *A.2d* 5

*Accord, In re Berardi*, 23 *N.J.* 485 (1955; *Sheeran v. Nationwide Mutual Insurance Company, Inc.*, 80 *N.J.* 548 (1979).

Whether the standard is set forth in detail or in general terms, with its scope to be gleaned from an examination of the statutory scheme as a whole, or if it can only be reasonably implied therefrom, the standard amounts essentially to a "rule of conduct." *Pascucci v. Vagott*, 71 *N.J.* at 49. It is intended to limit the discretion of the official vested with the authority to implement the legislative policy. The standard is not required to be so specific that it eliminates the need for the exercise of official discretion. *Leone Management Corp. v. Bd. of Comm'rs West N.Y.*, 130 *N.J.Super.* 569, 582 (Law Div.1974), aff'd *per curiam*, 144 *N.J.Super.* 353 (App.Div.1976). "A standard will not be deemed inadequate simply because the discretion might be abused. Arbitrary action by the official will not be anticipated." *Moyant v. Paramus*, 30 *N.J.* 528, 553 (1959).

However, to direct that a government official must act in the best interests of the municipality without further delineating what he is to consider as constituting the optimal state

of well being for the citizens of the municipality is to provide no standard at all, or, at best, one that is so vague as to be virtually meaningless. Every public official, without regard to any standard fixed by the Legislature, is required to act in the best interests of the public. Indeed, the Treasurer's determination to extend the moratorium could not be made at all without a consideration of the best interests of the people of Atlantic City. In addition, a more definitive "standard" cannot be inferred from the text of *c.*67 or from other legislative materials, which would provide an insight into what the Legislature deems to be in the best interests of the municipality. As drafted, *c.*67 vests in the Treasurer not only the authority to implement policy but, in effect, to determine policy as well. The latter authority is reserved to the Legislature and cannot be delegated. Thus, the executive officer's discretion to determine which tax list is to control local property taxation in Atlantic City for the tax year 1985 has not been "hemmed in by standards sufficiently definitive to guide [his] exercise [of the delegated power.]" *Cammarata v. Essex County Park Comm'n,* 26 *N.J.* 404, 410 (1958), citing *1 Sutherland, Statutory Construction* (3d ed. 1943), § 314.

Our Supreme Court has on several occasions upheld the constitutionality of legislative delegations which directed action in furtherance of the public interest, or under a similar general standard. However, in each of these cases, the broad grant of discretion was limited by a narrower standard within the act itself or by one that could be implied from a consideration of the statutory scheme as a whole. Thus, although legislative delegations accompanied by general standards are not *per se* unconstitutional, the delegated authority must be clearly tempered so that its exercise complies with legislative policy. *See, e.g., Burton v. Sills,* 53 *N.J.* at 90–91 (Statute providing that no firearm permit or identification card shall be issued by Superintendent of State Police "to any person where the issuance would not be in the interest of the public health, safety or welfare" did not contravene the separation of powers principle

where the legislative goal was clearly articulated and the broad standard was capable of being limited by reference to other language in statute); *Sheeran v. Nationwide Mutual Insurance Company, Inc.*, 80 *N.J.* at 558–559. (Although grant of authority to Commissioner of Insurance to promulgate "reasonable rules and regulations in order to effectuate the purpose of the No-Fault Act" appeared "to give the Commissioner untrammeled discretion in exercising his power to withhold consent [to renewal of an insurance carrier's license], *when the Act is considered as a whole, it is clear that his authority is sufficiently circumscribed*") [Emphasis supplied]; *Elizabeth Federal S. & L. Ass'n v. Howell*, 30 *N.J.* 190, 194 (1959) (The term "public interest" may not be judged in a vacuum, but, in the present case, it "acquires content from the overall objective of the statute to achieve a sound banking structure, healthily competitive, and fully adequate for the needs of the community").

## IV

▮ It should be noted that, at the time of the hearing in this matter, I declined to hold that *c.*67 was unconstitutional in contravention of *N.J. Const.* Art. VIII, § 1, par. 1(a), which provides as follows:

> Property shall be assessed for taxation under general laws and by uniform rules. All real property assessed and taxed locally or by the State for allotment and payment to taxing districts shall be assessed according to the same standard of value, except as otherwise permitted herein, and such real property shall be taxed at the general tax rate of the taxing district in which the property is situated, for the use of such taxing district.

I did state, however, "that it may be that the legislation is unconstitutional on the basis of the provision," and I now add that our Supreme Court decision in *Switz v. Middletown Tp.*, 23 *N.J.* 580 (1957), may very well compel that conclusion. In any event, my conclusion at the time of the hearing must not be understood to diminish in any way the importance and necessity of general revaluations at regular intervals nor the force and

effect to be given to an order of a county board of taxation directing a municipality to engage in a general revaluation.

In *Tri-Terminal Corp. v. Edgewater Bor.*, 68 *N.J.* 405 (1975), *cert.* den., 425 *U.S.* 958, 96 *S.Ct.* 1739, 48 *L.Ed.*2d 203 (1976), the Supreme Court referred to the planlessness and the chaotic local assessing practices discussed in *In re Appeals of Kents 2124 Atlantic Ave., Inc.*, 34 *N.J.* 21 (1961),[12] and the effect that the taxpayer's right to discrimination relief would have on improving assessing practices and encouraging frequent general revaluations. The court said that:

> In *Kents* Chief Justice Weintraub expressly recognized that the taxpayer's exigency there presented could have been avoided if the taxing district had conducted periodic general revaluations of all ratables throughout the district. 34 *N.J.* at 29, 32. He stated that if the remedy there granted provoked, as feared, "a flood of appeals," this might "well quicken the official conscience and induce the district to revalue and to keep the rolls current." 34 *N.J.* at 32. [*Tri-Terminal Corp., supra,* 68 *N.J.* at 410.]

Even before *Kents,* and "spurred by such decisions mandating assessment at true value as *Switz v. Middletown Tp., ...* and *Ridgefield Park v. Bergen Co. Bd. of Taxation,* 31 *N.J.* 420 (1960)," the county boards of taxation began to actively influence taxing districts to regularly revalue. *Tri-Terminal Corp., supra,* 68 *N.J.* at 411.

The requirement for frequent revaluations, in the interest of satisfying the constitutional mandate of uniformity and equal treatment in tax assessing, was also considered in *Piscataway Assoc., Inc. v. Piscataway Tp.,* 73 *N.J.* 546 (1977). The Court recognized the difficulty that assessors would encounter in annually reviewing assessments and changing valuations where appropriate, and "accordingly accepted the efficacy of a general revaluation for the years *immediately* succeeding its effective date.... However, *the vitality of this assumption dissipates*

---

[12]*See* Atlantic City v. Atlantic County Board of Taxation, supra, *n. 4, for a discussion of the chaotic assessing practices in Atlantic City resulting from, among other things, the fact that there has not been a revaluation in Atlantic City since 1962. Ironically,* Kents *dealt with the chaotic assessing practices in Atlantic City prior to 1962.*

*with the passage of time." Id.* at 551–552. [Emphasis supplied.] The court noted that Piscataway had been revalued during 1974 for the tax year 1975, having previously been revalued for the year 1965, and said, "it is to be hoped that it will do so in the future at shorter intervals than 10 years. Only in that way can practical uniformity in assessments be achieved; . . . ." *Id.* at 560. This must be compared with the facts of the present case. Atlantic City was last revalued in 1962. It was ordered by this court to revalue for 1983. No revaluation has yet been accomplished.

It is therefore all too apparent that the goals of uniformity in assessments "according to the same standard of value," *Switz,* 23 *N.J.* at 593, as required by our Constitution, cannot be effectively realized unless county boards of taxation order general revaluations on a frequent, recurring basis and *municipal assessors comply with such orders.* Therefore revaluation moratorium statutes may violate the tax uniformity provision of the Constitution.

## V

In the complaint plaintiffs seek a restoration of the *status quo ante* if the statute is declared unconstitutional. However, even though the statute is unconstitutional, plaintiffs are not entitled to that remedy. In dealing with unconstitutional enactments, a court possesses "broad discretionary power in the balancing of all hardships and equities in shaping an equitable decree." *Salorio v. Glaser,* 93 *N.J.* 447, 469 (1983), *cert.* den., 464 *U.S.* 993, 104 *S.Ct.* 486, 78 *L.Ed.*2d 682 (1983). Pursuant to this grant of discretion, I conclude that, in view of what is "consonant with public policy," *Coons v. American Honda Motor Co., Inc.,* 96 *N.J.* 419 (1984) (appeal pending),[13]

---

[13]The court has four alternative approaches to defining the scope of application of a decision declaring that a statute is unconstitutional. These are (1) to make the new rule purely prospective; (2) apply the new rule to future cases and to the case announcing the new rule; (3) grant the new rule "limited

the determination that $c.67$ is unconstitutional is to be given prospective effect only.

> There is no question but that appellate courts in this State and elsewhere have long regarded themselves as empowered and justified in confining the effect of a decision of first impression or of novel or unexpected impact to prospective application if considerations of fairness and justice, related to reasonable surprise and prejudice to those affected, seemed to call for such treatment. [*Salorio, supra,* 93 *N.J.* at 465.]

In *Salorio* the court ruled that the Emergency Transportation Tax Act (ETT) was unconstitutional. There were references in the opinion to the length of time that the act had been in force, and to the fact that plaintiff in that action had waited some 15 years before attacking the constitutionality of the enactment. The prospective application of the determination that the statute is unconstitutional did not, however, depend on that delay. It depended instead on the havoc and the chaos that would result from giving the determination retroactive effect. Referring to *Lemon v. Kurtzman,* 411 *U.S.* 192, 93 *S.Ct.* 1463, 36 *L.Ed.*2d 151 (1973), our Supreme Court said that:

> retroactivity depend[s] upon a consideration of the particular relations between and conduct of the parties, of rights it had vested, of status, of prior determinations deemed to have finality, and of public policy.... [S]tatutory law is a "hard fact[ ] on which people must rely in making decisions and in shaping their conduct." [*Salorio, supra,* 93 *N.J.* at 464.]

Notwithstanding that the statute is unconstitutional, I would be remiss in concluding, under all of the circumstances of this case, that the present tax assessment rolls of the city should be set aside and supplemented and replaced by another assessment roll for the year 1984. This would result in extraordinary problems in administering the rights of taxpayers to have those assessments reviewed in accordance with the statutory review process. Under the circumstances of this case, I cannot order Atlantic City to send out new tax bills nor can I fix new dates

---

retroactivity", and (4) give the new rule complete retroactive effect. *Coons,* 96 *N.J.* at 425.

for appeals to the county board and to the tax court. There is no authority in the law for any such result. It would also be intolerable for the city to be faced with the shutting off of tax revenues, which would result from the delay in sending out new bills, in adjusting tax obligations, in collecting additional tax payments where they might be due, and in allowing credits where they might be due. The city cannot be deprived of its source of revenue from local property taxes for what might be a significant period of time. Indeed, the court in *Salorio* stated that "[t]he course of non-retroactivity when invalidating public revenue-raising measures is not without precedent." *Id.* at 466. In fact, the court's conclusion that the invalidation on constitutional grounds of the ETT should not be applied retroactively was based primarily upon the effect of such an approach upon the State budget and the administrative problems that would result.

> We are persuaded to fix a prospective date because of our concern for the fiscal and administrative problems that would be engendered if the State were compelled to surrender ETT receipts before the end of the fiscal year. The State should be afforded a reasonable period of time to devise alternative revenue raising methods, abandon or postpone transportation projects or consider some other suitable solutions. [*Id.* at 467.]

*See also Riehm v. Taxation Div. Director,* 7 *N.J.Tax* 88 (Tax Ct.1984). Finally, the *Salorio* court concluded that, having declared the statute unconstitutional, a decision not based on the balancing of equities, the court could use its "broad discretionary power in the balancing of all hardships and equities in shaping an equitable decree" or remedy following its determination that the statute was unconstitutional. In balancing equities here, I find that the havoc to be wrought upon the city is so overwhelming, when compared to the benefit to be gained by plaintiffs, or by other taxpayers, that the unconstitutionality of the statute must not be made retroactive.

The subject statute, *c.*67, is declared unconstitutional effective October 23, 1984, the date of the hearing.